UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DONALD W. IRVING, et al.,

Plaintiffs,

v.

LENNAR CORPORATION, et al.,

Defendants.

No. 2:12-CV-0290 KJM EFB

ORDER

Defendants have filed a motion to dismiss plaintiffs' Second Amended Complaint. The court ordered it submitted on the pleadings. After considering the parties' arguments, the court GRANTS the motion and gives plaintiffs leave to file a Third Amended Complaint.

I.  BACKGROUND

On February 27, 2012, plaintiffs Donald Irving, Fammie Holmes-Irving, Chandresh Bhakta, Tina Bhakta, John Carreras, Isidro Escareno, Dennis Frantom, Dan Lewerenz, Rui Lopes, Rose Lopes, Alfredo Lorica, Eugenia Lorica, Dan Masciovecchio, Greg Peterson, Olga Peterson, E. Scott Coelho, Valerie Salazar, Themis Sakellarious, Jimmy Turner, Sharon Turner, Greg Weasel, Virginia Weitzel, Christopher White, Monique White, Thomas Williams and Makeiba Scott (collectively "plaintiffs") filed a First Amended Complaint ("FAC"), alleging six causes of action stemming from defendants' alleged acts and omissions in connection with the Estancia Estates and Legends in Rio Del Or communities, in the Plumas Lake Subdivision in

1    Yuba County: (1) violation of the Interstate Land Sales Act ("ILSA") by means of untrue

2    statements in the sale of subdivided lots, 15 U.S.C. § 1703; (2) unfair competition and business

3    practices ("UCL"), CAL. BUS. & PROF. § 17200; (3) false and misleading advertising or

4    statements in the sale of real property, CAL. BUS. & PROF. § 17500; (4) rescission based on fraud

5    or mistake, CAL. CIV. CODE § 1689; (5) RICO violations, 18 U.S.C. §§ 1961, *et seq.*; (6) Sherman

6    Act and California anti-trust violations, 15 U.S.C. § 1 & CAL. BUS. & PROF. CODE § 16700,

7    *et seq.*; and (6) violation of the Covenants, Conditions and Restrictions ("CC&Rs") for both

8    developments.  ECF No. 7.

9              On March 26, 2012, Lennar Corporation ("Lennar"), Lennar Renaissance, Inc.

10   ("Renaissance), Lennar Sales Corporation ("Sales"), and Universal American Mortgage Company

11   of California ("UAM") (collectively "defendants") filed a motion to dismiss the FAC.  The court

12   denied the motion as to the claim that defendants violated the Covenants, Conditions and

13   Restrictions (CC&Rs) and granted the motion as to the other claims, giving plaintiffs leave to

14   amend as to the fraud, rescission, UCL, Sherman Act and Cartwright Act claims.  ECF No. 36.

15             On April 19, 2013, plaintiffs filed their Second Amended Complaint (SAC),

16   raising the following claims:  (1) an ILSA violation based on untrue statements in the sale of

17   subdivided lots,  15 USC. § 1703; (2) a UCL claim, based on defendants' alleged manipulation of

18   market values and false and misleading misrepresentations, CAL. BUS. & PROF. CODE § 17200 ;

19   (3) a claim of false and misleading advertising or statements in the sale of real property, CAL.

20   BUS. & PROF. CODE § 17500; (4) a claim for rescission based on fraud or mistake, CAL. CIV.

21   CODE § 1689; (5) Sherman Act and Cartwright Act violations, 15 U.S.C. § 1 & CAL. BUS. &

22   PROF. CODE § 16700, *et seq.*; and (6) a claim for a violation of the CC&Rs.  ECF 33.

23             On May 13, 2013, defendants filed a motion to dismiss the second amended

24   complaint, alleging generally that all the claims are barred by the statute of limitations and that

25   plaintiffs fail to state a claim as to any of their causes of action.  ECF 36.

26   /////

27   /////

28   /////

2

1   II.  ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

2               Plaintiffs allege the following facts in their second amended complaint:

3               Defendant Lennar is the largest residential homebuilder in the United States.

4   Sometime before 2007, Lennar expanded its business so that it not only built houses, but also

5   marketed them to prospective buyers and provided buyers with financing, appraising, and title

6   services.  SAC, ECF No. 33 ¶¶ 15, 17.  To that end, Lennar formed Renaissance, Sales, and

7   UAM.  Collectively these entities worked together to keep major aspects of the sale within their

8   control by providing "easy money" not otherwise available in the market to finance the home

9   purchases; this allowed them to increase or decrease incentives for the purchases at their whim

10  and also allowed them to increase the home prices.  Ultimately Lennar controlled every aspect of

11  the sale of homes to plaintiffs.  ECF No. 33 ¶ 43.

12              In 2006 and 2007, plaintiffs purchased homes in Lennar's Estancia Estates and

13  Legends at Del Rio in reliance on defendants' representations and the information provided as

14  part of defendants' fraudulent scheme of market manipulation.  ECF No. 33 ¶¶ 1, 23.  Each of

15  these early buyers was required to have exceptional credit and had to provide a large down

16  payment; each was told that subsequent buyers would have to meet the same requirements.  ECF

17  No. 33 ¶ 48.

18              Although each plaintiff's account varies slightly, each alleges generally that

19  defendants' New Home Consultants ("Consultants") informed prospective buyers that if they

20  used defendant UAM, who would provide an "everything included" loan, the buyers would

21  receive significant financial incentives, which in fact made the purchases feasible for the

22  plaintiffs.  The Consultants provided Community Maps, which described the phases of

23  construction, including the planned parks, common areas, and roads; gave the plaintiffs "purchase

24  agreements and deposit receipts," which said funds would not be released from escrow until the

25  common areas and improvements in that particular phase had been completed; imposed CC&Rs

26  that restricted development to a community free of nuisance with homes to be occupied by single

27  families in a safe suburban neighborhood; and provided a Department of Real Estate ("DRE")

28  Report, which stated defendants intended to sell all the lots in the communities, that buyers would

3

1   be required to sign an occupancy agreement requiring them to live in the houses for at least a

2   year, and that defendants would complete construction of the planned streets.  In addition, the

3   Consultants told plaintiffs that subdivision improvements would be completed in a short period of

4   time; that if buyers did not use UAM financing they would lose significant financial incentives;

5   that defendants would not sell to investors; and that the price set for the houses was the true value

6   of the properties.  ECF No. 33 ¶¶ 24-40.  Other oral representations included claims that at least

7   one community would have a park, grocery store and professional building.  ECF No. 33

8   ¶¶ 26-40.

9          As part of their scheme, defendants provided that only buyers of Lennar homes

10   could use UAM and only UAM could provide discount incentives on the homes.  ECF No. 33

11   ¶ 42.  As a result, plaintiffs purchased houses at artificially inflated prices and paid artificially

12   high prices for defendants' other products, such as financing, title services and appraisal services,

13   with the assurance that the home values would continue to rise.  ECF No. 33 ¶ 42.

14          Despite the Consultants' assurance that defendants would sell only to buyers who

15   intended to live in the homes, defendants marketed the houses to investors and to buyers who

16   posed an abnormally high risk of foreclosure.  ECF No. 33 ¶ 42.  Defendants' representatives

17   encouraged buyers to provide inflated and unverified income information, underwrote sub-prime

18   loans for people with bad credit, did not require substantial down payments, provided incentives

19   to cover closing costs, and used inflated appraisals.  ECF No. 33 ¶ 51.  Because the buyers used

20   UAM, defendants were aware that certain buyers were not qualified to purchase their homes.

21   ECF No. 33 ¶ 53.  Nevertheless, because these loans were securitized, Lennar did not absorb the

22   losses stemming from foreclosures.  ECF No. 33 ¶ 45.  The value of plaintiffs' homes decreased,

23   however, when the homes sold to unqualified buyers were foreclosed or became subject to short

24   sale.  ECF No. 33 ¶ 49.  Moreover, defendants should have known that prospective purchasers

25   would want to know if the surrounding homes were being sold to people at high risk for

26   foreclosure, but they did not provide this material information or otherwise disclose the high

27   number of sub-prime loans issued for the subdivisions.  ECF No. 33 ¶¶ 56, 59, 64.  Even though

28   defendants should have known that foreclosures in the neighborhoods would impact the

1   desirability of the homes, they assured plaintiffs that the homes were good investments.  ECF No.

2   33 ¶¶ 57-58.  As a result of the foreclosures, short sales and sales to investors, many lots in the

3   subdivisions are unkempt, houses are being occupied by multiple families or by transients, and

4   crime has increased.  ECF No. 33 ¶ 62.

5           In addition, as part of the scheme, defendants falsely promised they would provide

6   and then maintain safe and secure neighborhoods and fully developed communities consisting of

7   a defined number of completed homes, supported by the promised infrastructure, including parks,

8   recreation facilities, retail outlets and professional spaces; at the time plaintiffs purchased the

9   homes, the area was undeveloped and not supported by adequate public, private, commercial,

10  retail and other services.  ECF No. 33 ¶¶ 68-69, 71, 73.

11          Finally, defendants have violated the CC&Rs, which require owners to maintain

12  their homes, and prohibit the creation of a nuisance.  ECF No. 33 ¶¶ 75, 77.

13          Plaintiffs allege they discovered the fraud, misrepresentation and unlawful acts

14  within the two years before the original complaint was filed and were not able to discover the

15  fraud with the exercise of reasonable diligence.  ECF No. 33 ¶ 80.  Specifically, they did not learn

16  about the sale to unqualified buyers and investors until several houses had posted foreclosure

17  notices and "for sale" signs appeared in the subdivision during 2011.  ECF No. 33 ¶ 80a.  They

18  did not realize that the purchase price of their houses was artificially inflated compared to non-

19  Lennar homes in the Sacramento area until they attempted to refinance their homes and secured

20  appraisals from non-UAM affiliated appraisers and learned that the prices they paid were not

21  commensurate with comparable homes.  ECF No. 33 ¶ 80b.  Moreover, plaintiffs did not realize

22  that Lennar was not going to complete the subdivisions and the promised infrastructure until the

23  Lennar trailer remained unmanned, Lennar trucks stopped coming to the subdivisions, and all

24  other signs of construction ceased and the unimproved lots and common areas became dumping

25  grounds for debris and gardens of weeds, all of which occurred in 2010.  ECF No. 33  ¶ 80c.

26  Finally, they allege that it was only within a year before filing the initial complaint that they

27  learned Lennar had taken money from escrow without completing the construction of

28  improvements and common areas.  ECF No. 33 ¶ 80d.

1   III.  STANDARD FOR A MOTION TO DISMISS

2           Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to

3   dismiss a complaint for "failure to state a claim upon which relief can be granted."  A court may

4   dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged

5   under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

6   1990).  A motion to dismiss under this rule may also challenge the sufficiency of fraud

7   allegations under the more particularized standard of Rule 9(b) of the Federal Rules of Civil

8   Procedure.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003).

9           Although a complaint need contain only "a short and plain statement of the claim

10  showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), in order to survive a motion

11  to dismiss this short and plain statement "must contain sufficient factual matter . . . to 'state a

12  claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

13  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must include something

14  more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and

15  conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Id.* (quoting

16  *Twombly*, 550 U.S. at 555).  Determining whether a complaint will survive a motion to dismiss

17  for failure to state a claim is a "context-specific task that requires the reviewing court to draw on

18  its judicial experience and common sense."  *Id.* at 679.  Ultimately, the inquiry focuses on the

19  interplay between the factual allegations of the complaint and the dispositive issues of law in the

20  action.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

21          In making this context-specific evaluation, this court must construe the complaint

22  in the light most favorable to the plaintiff and accept as true the factual allegations of the

23  complaint.  *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007).  This rule does not apply to "'a legal

24  conclusion couched as a factual allegation,'"  *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (quoted

25  in *Twombly*, 550 U.S. at 555), nor to "allegations that contradict matters properly subject to

26  judicial notice" or to material attached to or incorporated by reference into the complaint.

27  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir. 2001).

28  /////

6

1      A district court ruling on a motion to dismiss may consider a document the

2  authenticity of which is not contested, and upon which the plaintiff's complaint necessarily

3  relies." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), superseded by statute on other

4  grounds as recognized in *Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir.

5  2006).  The Ninth Circuit has explained that such reliance is permissible when "plaintiff's claim

6  depends on the contents of a document" that is not attached to the complaint.  *Knievel v. ESPN*,

7  393 F.3d 1068, 1076 (9th Cir. 2005).  Defendants have provided copies of the CC&Rs for both

8  developments; as plaintiffs' complaint relies on these, the court may properly consider them in

9  resolving the motion to dismiss.

10      Finally, a party may raise a statute of limitations argument in a motion to dismiss

11  if it is apparent from the face of the complaint that the complaint was not timely filed and that

12  plaintiff will be unable to prove facts to establish the timeliness of the claim.  *Von Saher v.*

13  *Norton Simon Museum*, 592 F.3d 954, 969 (9th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S. Ct.

14  3055 (2011); *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995).

15  Plaintiffs allege they purchased their houses between 2006 and 2007; defendants contend that the

16  claims are barred by the statute of limitations and that plaintiffs have not adequately pleaded

17  delayed discovery.

18  IV.  ANALYSIS

19    A.  Interstate Land Sales Act, 15 U.S.C. § 1703 (ILSA)

20      Under the fraud provisions of the ILSA, it is unlawful for any developer to make

21  use of any means of communication in interstate commerce or the mails to employ a scheme to

22  defraud, to obtain money or property by means of an untrue statement of a material fact or

23  omission of a material fact or to engage in any practice that would operate as a fraud upon a

24  purchaser.  15 U.S.C. § 1703(a)(2)(A)-(C); *see generally Kenneally v. Bank of Nova Scotia*,

25  711 F. Supp. 2d 1174, 1185 (S.D. Cal. 2010).  Plaintiffs allege that defendants violated the ILSA

26  through the scheme described in the complaint "that operated or would operate as a fraud or

27  deceit upon Plaintiff purchasers."  ECF No. 33 ¶ 84.

28  /////

1          i. Statute of Limitations

2                  For ILSA fraud claims under 15 U.S.C. § 1703(1)(2)(A)-(C), "no action shall be

3      maintained . . . [¶] more than three years after discovery of the violation or after discovery should

4      have been made by the exercise of reasonable diligence."  15 U.S.C. § 1711(a)(2); *see*

5      *Streambend Prop. III, LLC v. Sexton Lofts, LLC*, Civil No. 1-cv-4745 JMD/SER, 2013 WL

6      673854 (D. Minn. Jan. 28, 2013) (stating that the ILSA imposes the duty to exercise reasonable

7      diligence on purchasers in discovering violations), *recommendation adopted by* 2013 WL 674014

8      (D. Min.. Feb. 25, 2013).

9                  Under this "discovery rule," the statute of limitations begins to run only when a

10     plaintiff knows the "'critical facts' of his injury, which are 'that he has been hurt and who has

11     inflicted the injury.'"  *Bibeau v. Pac. Nw. Research Found. Inc*., 188 F.3d 1105, 1108 (9th Cir.

12     1999), *amended on denial of rehearing*, 208 F.3d 831 (9th Cir. 2000) (quoting *United States v.*

13     *Kubrik*, 444 U.S. 111, 122 (1979)); *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 130 S. Ct. 1784,

14     1793-94 (2010) (describing the "discovery rule" as a "doctrine that delays accrual to a cause of

15     action until a plaintiff has 'discovered' it" and noting that fraud is "discovered" when it could

16     have been discovered in the exercise of diligence).  The discovery rule incorporates a diligence

17     requirement, for if a plaintiff is not diligent in discovering the critical facts, he will not be able to

18     bring suit after the statute of limitations has run.  *Bibeau*, 188 F.3d at 1108.  Nevertheless, the

19     limitations period will not begin "upon mere suspicion of the elements of a claim."  *O'Connor v.*

20     *Boeing N. Am., Inc*., 311 F.3d 1139, 1147-48 (9th Cir. 2002).

21                 Defendants argue that plaintiffs' claims of delayed discovery are too conclusory,

22     noting that plaintiffs could easily have discovered they had paid more for their homes than

23     comparable homes in the area.  Defendants question whether there was a complete absence of

24     "for sale" signs before 2011 and why plaintiffs failed to realize their homes were decreasing in

25     value when the decline in home prices in the area began (and was well publicized) beginning in

26     2006.  ECF No. 36 at 14.  They also argue that plaintiffs' claim that "for sale" signs became

27     "noticeable" in the subdivisions is not plausible in light of their claim that defendants' practices

28     led to greater foreclosures and short sales than in other comparable neighborhoods.  ECF No. 36

1   at 15.  Finally, they argue that plaintiffs cannot claim generally that collectively "they" first began

2   to suspect their injury when they sought to refinance their homes but rather each plaintiff must

3   provide individualized information.

4           Plaintiffs counter that they have adequately pleaded delayed discovery and will be

5   able to amend to provide additional details if the court so requires.  ECF No. 40 at 19-20.

6           Although the court agrees that plaintiffs have failed to provide sufficient,

7   individualized detail supporting their claim of delayed discovery, it rejects defendants' argument

8   that plaintiffs are required to show they did not notice "for sale" signs earlier than 2011 or that

9   they could have researched the costs of other houses at the time they purchased them.  Contrary to

10  defendants' suggestion, there was no requirement that plaintiffs investigate possible wrong-doing

11  even before they were aware of any injury.

12          Although the complaint is not pleaded with total clarity, plaintiffs are alleging they

13  were injured by defendants' scheme, which was implemented in several ways.  Nothing in the

14  complaint suggests plaintiffs knew they were injured when they purchased the houses and so

15  nothing suggests they had any cause to investigate the prices of houses in comparable

16  subdivisions or even to question any initial "for sale" signs, especially in light of the economic

17  downturn.  Plaintiffs allege generally they realized they were injured when they sought to

18  refinance their homes and learned through unbiased appraisals that they had paid inflated prices

19  and had, in essence, been "upside down" in their houses from the beginning, and when they

20  realized defendants were not going to complete the promised infrastructure.  They further allege

21  that these things triggered their investigation into the cause of the injury.  *See generally Bibeau*,

22  188 F.3d at 1108 (observing that the critical fact for purposes of the delayed discovery doctrine

23  was when the plaintiff should have been aware he was injured by particular experiments; that he

24  knew he was suffering a variety of health problems did not necessarily mean he should have

25  associated them with the particular experiments).

26          Defendants are correct, however, that the plaintiffs have failed to plead

27  individually how each became aware of his or her injury.  As defendants observe, plaintiffs rely

28  on a general claim that "they" learned about the problems as a collective rather than as individual

1  plaintiffs.  To support their claims of delayed discovery, each plaintiff must allege when he or she

2  became aware of the injury.

3          A court need not give a party leave to amend to flesh out claims of delayed

4  discovery if amendment would be futile because the complaint does not state a claim.  In this

5  case, the complaint is not adequately pleaded in certain respects, but as the court will give

6  plaintiffs one more chance to plead their fraud claims adequately, they will also have an

7  additional chance to plead delayed discovery with particularity.

8          ii.  Failure to State a Claim

9              a.  Specificity

10         Defendants argue that the ILSA fraud claims in the SAC are still too vague to meet

11 the heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure.

12         In addition to the pleading requirements of Rule 8, allegations of fraud must meet

13 heightened pleading standards.  Under Rule 9(b), a plaintiff who alleges fraud "must state with

14 particularity the circumstances constituting the fraud," but may "aver[] generally" the state of

15 mind animating the fraud.  The pleading must "'be specific enough to give defendants notice of

16 the particular misconduct . . . so that they can defend against the charge and not just deny that

17 they have done anything wrong.'"  *Sanford v. Memberworks, Inc*., 625 F.3d 550, 558 (9th Cir.

18 2010) (quoting *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1124 (9th Cir. 2009)); *Neubronner v.*

19 *Milken*, 6 F.3d 666, 671-72 (9th Cir. 1993) ("A pleading is sufficient under Rule 9(b) if it

20 identifies the circumstances constituting fraud so that the defendant can prepare an adequate

21 answer from the allegations." (internal quotation marks, citation, omitted)).  To avoid dismissal,

22 the complaint must describe the time, place, and specific content of the false representations and

23 identify the parties to the misrepresentations.  *Kearns*, 567 F.3d at 1124.  When fraud is the basis

24 of a claim under California's false advertising or unfair competition laws or under the ILSA, the

25 pleading requirements of Rule 9(b) govern.  *In re Sony Grand Wega KDF-E A10/20 Series Rear*

26 *Projection HDTV Television Litig*., 758 F. Supp. 2d 1077, 1093 (S.D. Cal. 2010) (FAL);

27 *Rogers v. Wesco Prop.*, No. CV 09–08149–PCT–MHM, 2010 WL 3081352, at *5 (D. Ariz.

28 /////

1    Aug. 4, 2010) (ILSA); *Rodriguez v. JP Morgan Chase & Co.*, 809 F. Supp. 2d 1291, 1297 (S.D.

2    Cal. 2011) (UCL).

3                    Relying on *Cherrone v. Florsheim Dev.*, No. CIV 2:12-02069 WBS CKD, 2013

4    WL 772526 (E.D. Cal. Feb. 28, 2013), defendants argue that plaintiffs have not sufficiently

5    pleaded their fraud claims.  In *Cherrone*, the plaintiffs sued a developer and its related businesses,

6    alleging that they violated the ILSA, Sherman Act and several California statutes in connection

7    with the building and sales of houses in a subdivision.  Plaintiffs alleged that defendants promised

8    falsely that they would refund the difference between the house's price at purchase and at the end

9    of the year in brochures, press releases, radio, television and on their website and on banners

10   displayed in the subdivisions.  *Id.* at *1.  They also alleged that defendants misrepresented certain

11   things about further development of the subdivision in subdivision maps, signage, brochures, and

12   verbal representations from sales representatives.  *Id.*  The court granted the defendants' motion

13   to dismiss, reasoning that plaintiffs had not identified a "specific statement or omission, let alone

14   the person or marketing material making the misrepresentation.  They refer to a broad array of

15   advertising material without identifying a specific brochure or advertisement, nor do they explain

16   how each of the plaintiffs encountered the alleged misrepresentations." *Id.* at *2.  In *Von Koenig

17   v. Snapple Beverage Corp.*, 713 F. Supp. 2d 1066 (E.D. Cal. 2010), in contrast, the court found

18   that plaintiffs had pleaded fraud with the requisite particularity when they alleged that between

19   March 2005 and March 2009, defendant used the term "All Natural" in labeling its drink products

20   and submitted examples of labels from several of defendant's products.  *Id.* at 1077.  The court

21   found the complaint sufficiently pleaded to withstand a motion to dismiss.  *Id.*

22                   This case has some similarities to each case, *Cherrone* and *Von Koenig*.  Plaintiffs

23   have presented a copy of a flyer they claim identifies Lennar as a stable builder committed to the

24   local community; in fact it says only that the Lennar story is simple:  "quality, value and integrity

25   since 1954."  ECF No. 33 at 87.  Plaintiffs also allege more generally that mock-ups showed the

26   lots and homes to be constructed, but provide no specific description of these demonstratives.

27   They also rely on community maps, allegedly showing completed construction, but the map they

28   /////

1   have attached does not match their characterization.  *See* ECF No. 33 at 95.  This portion of their

2   pleading is more like *Cherrone*.

3          Plaintiffs have provided additional flyers, one of which says in tiny print that

4   "[a]ny builder incentives offered are subject to financing through Universal American Mortgage

5   Company," while another advises that defendants' "everything included" loan could save a

6   purchaser up to $8000 so long as he secured the loan through UAM.  ECF No. 33 at 89, 91.

7   Although they do not attach the documents, plaintiffs allege that the "Purchase Agreement and

8   Deposit Receipt and Escrow Instructions" specifically said that funds would not be released from

9   escrow until all the common areas for the particular phase were completed; a Department of Real

10   Estate Public Report said that defendants intended to sell all the lots in the community, that

11   buyers would be required to sign an occupancy agreement, and that defendants would complete

12   the streets; and CC&Rs restricted development to a community free of nuisance, consisting of

13   safe and stable neighborhoods.  Finally, they identify the oral representations that the New Home

14   Consultants representatives made to each of the plaintiffs in this case.  Although plaintiffs do not

15   explain what is false about the first flyer with the tiny print, they do allege that the $8,000

16   incentive described in the second flyer was illusory, they have adequately described the falsity of

17   the other statements pled.  Plaintiffs also have identified the New Home Consultants

18   representatives, by name or initials, with whom each plaintiff interacted, as well as the time

19   period during which the plaintiffs met with the consultants.  As in *Von Koenig*, as to this

20   collection of exhibits and the oral representations, plaintiffs have not relied on general claims

21   about brochures and advertisements, but have provided documentary support and descriptions of

22   oral representations, provided a time period during which the representations were made,

23   identified the people making the representations, and described the falsity of the claims, sufficient

24   to enable defendants to respond.

25          Nevertheless, if plaintiffs wish to amend those portions of the complaint identified

26   here as deficient, they may do so when they amend their allegations of delayed discovery.

27   /////

28   /////

1           b. Puffery

2              Defendants argue the alleged representations about the value of the homes they

3 sold is puffery and is therefore not actionable.  They specifically challenge plaintiffs' claim that

4 defendants implicitly or explicitly represented that the houses were good investments, that Lennar

5 was a stable builder committed to the community and that the neighborhood would be safe and

6 stable.  Plaintiffs argue that the defendants' statements do not qualify as puffery because the

7 statements as to value were not mere predictions, but rather would have been true only if

8 defendants had completed the promised infrastructure.  They do not respond directly to

9 defendants' argument concerning Lennar's stability as puffery.

10              The Ninth Circuit has said "a statement is considered puffery if the claim is

11 extremely unlikely to induce consumer reliance.  Ultimately the difference between a statement of

12 fact and mere puffery relies in the specificity or generality of the claim." *Newcal Industries, Inc.*

13 *v. IKON Office Solutions*, 513 F.3d 1038, 1053 (9th Cir. 2008); *Stickrath v. Gobalstar, Inc*.,

14 527 F. Supp. 2d 992, 998-99 (N.D. Cal. Sep. 25, 2007) (claim that product used brand-name

15 components was not puffery because it was a factual representation that could be proved or

16 disproved during discovery).  To constitute an affirmative misrepresentation, a statement must

17 make a "specific and measurable claim, capable of being proved false or of being reasonably

18 interpreted as a statement of objective fact." *Coastal Abstract Serv. v. First Am. Title Ins. Co*,

19 173 F.3d 725, 731 (9th Cir. 1999); *Star Child II, LLC v. Lanmar Aviation, Inc*., Civ.

20 No. 3:11-CV-01842 (AWT), 2013 WL 1103915 (D. Conn. Mar. 16, 2013) (finding that

21 defendant's claim to have implemented stringent safety standards was not puffery when

22 defendant had no heightened safety standards and this was a representation or misrepresentation

23 of fact); *Freudenberg v. E\*Trade Fin. Corp*., 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) (finding

24 defendant's statements about its organic growth in cash, assets and credit among other things, was

25 not puffery when it contradicted fact that "vast majority" of the loans were purchased from

26 questionable outside lenders).

27              The misrepresentations alleged here are puffery.  Plaintiffs have presented nothing

28 suggesting that Lennar was not a stable builder, and so have not suggested any misrepresentation

1   of existing fact.  Moreover, any claim that the subdivisions would be "safe" or "stable" are

2   general claims, predictions of future events outside defendants' control.  Plaintiffs' claim that

3   defendants were selling to investors and those at high risk for foreclosure does not take this claim

4   out of the realm of puffery, as plaintiffs have not pleaded that such sales necessarily result in

5   dangerous, unstable places.

6           Plaintiffs make a stronger case for their claim that defendants' assurances of value

7   are actionable misrepresentations.  While completion of the promised infrastructure and all the

8   planned units would not necessarily render the homes were a good value, the court will allow

9   plaintiffs an additional opportunity to plead further details of this aspect of their ILSA fraud

10  claim, if they are able.

11          Accordingly, any amended ILSA fraud claim should not include allegations of

12  Lennar's instability as a builder, misrepresentations regarding "safety," or sales to investors and

13  high risk purchasers but may include allegations based on completion of promised infrastructure.

14      B.   Business and Professions Code Sections 17200 and 17500

15          In the SAC, plaintiffs allege that defendants violated California's Unfair

16  Competition Law (UCL), Business and Professions Code § 17200, *et seq*., through its marketing

17  scheme, which attempted to manipulate and control the market values of the homes it sold to

18  plaintiffs and so duped plaintiffs into purchasing homes.  The marketing scheme, with its inflated

19  home prices, financial incentives, apparent investment opportunities in an appreciating

20  marketplace, and the promises to complete the development and infrastructure made defendants'

21  homes more attractive.  They also allege that the scheme violated anti-trust laws and the ILSA.

22          Plaintiffs further claim that defendants violated California's False Advertising Law

23  (FAL), Business and Professions Code § 17500, by manipulating the market and making false

24  and misleading representations.

25      i.   Statute of Limitations

26          The statute of limitations for actions under California Business and Professions

27  Code §§17200 and 17500 is four years.  *CytoSport, Inc. v. Vital Pharm., Inc*., 894 F. Supp. 2d

28  1285, 1295 (E.D. Cal. 2012); *Cortez v. Purolator Air Filtrations Prod. Co.*, 23 Cal. 4th 163, 178

1  (2000); CAL. CIV. CODE § 17208.

2      The Ninth Circuit has held that claims under the UCL begin to run on the date of

3  the violation and not the date of discovery.  *Karl Storz Endoscopy-Am., Inc. v. Surgical Tech.,*

4  *Inc*., 285 F.3d 848, 857 (9th Cir. 2002).  Recently, however, the California Supreme Court has

5  held that the claims under the UCL are "governed by common law accrual rules," including

6  delayed discovery.  *Aryeh v. Canon Bus. Solutions, Inc*., 55 Cal. 4th 1185, 1196 (2013).  The

7  Ninth Circuit's interpretation of California law is "'binding in the absence of any subsequent

8  indication from the California courts that our interpretation was incorrect,'" *Jones-Hamilton Co.*

9  *v. Beazer Materials & Servs., Inc*. 973 F.2d 688, 696 n.4 (9th Cir. 1992) (quoting *Owen v. United*

10  *States*, 713 F.2d 1461, 1464 (9th Cir. 1983)); in this case, the *Aryeh* decision is a clear indication

11  that the Ninth Circuit was incorrect in resolving this issue relating to the statute of limitations for

12  UCL claims.

13      In California, a party is deemed to have discovered the fraud when it "'has reason

14  at least to suspect the factual basis for its elements.'"  *Fox v. Ethicon Endo-Surgery, Inc*.,

15  35 Cal. 4th 797, 807 (2005) (quoting *Norgart v. The Upjohn Co.*, 21 Cal. 4th 383, 398 (1999)).

16  This rule "delays accrual until the plaintiff has, or should have, inquiry notice of the cause of

17  action."  *Id*.  Accordingly, plaintiffs "are charged with presumptive knowledge of an injury if they

18  have information of circumstances to put them on inquiry or if they have the opportunity to obtain

19  knowledge from sources open to their investigation."  *Rosal v. First Fed. Bank of California*,

20  671 F. Supp. 2d 1111, 1131 (N.D. Cal 2009) (citing *Fox*, 35 Cal. 4th at 897-98).  A party relying

21  on the delayed discovery rule must plead facts showing the time and manner of the discovery and

22  the inability to have made earlier discovery despite reasonable diligence; conclusory allegations

23  are not sufficient.  *E-Fab Inc., v. Accountants, Inc., Servs*., 153 Cal. App. 4th 1308, 1319 (2007).

24      As with the ILSA claim, plaintiffs have not adequately alleged what caused them

25  to suspect they were injured and the cause of the injury.  They will be given leave to amend if

26  they are able to do so consonant with Rule 11.

27      ii.  Failure to State a Claim

28      "To bring a UCL claim, a plaintiff must show either an (1) unlawful, unfair, or

15

1  fraudulent business act or practice, or (2) unfair, deceptive, untrue or misleading advertising."

2  *Lippitt v. Raymond James Fin. Servs., Inc.*, 340 F.3d 1033, 1043 (9th Cir. 2003) (internal

3  quotations omitted); *Gardner v. Am. Home Mortg. Servicing, Inc.*, 691 F. Supp. 2d 1192, 1201

4  (E.D. Cal. 2010).  Because the statute is phrased in the disjunctive, a practice may be unfair or

5  deceptive even if is not unlawful, or vice versa.  *Lippitt*, 340 F.3d at 1043.

6       An action is unlawful under the UCL and independently actionable if it constitutes

7  a violation of another law, "be it civil or criminal, federal, state, or municipal, statutory,

8  regulatory, or court-made."  *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1999);

9  *Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992).  Because the statute

10  borrows violations of other laws, a failure to state a claim under the "borrowed statute" translates

11  to a failure to state a claim under the unlawful prong of the UCL.

12       An act is "unfair" under the UCL if it "significantly threatens or harms

13  competition, even if it is not specifically proscribed by another law" or "is tethered to some

14  legislatively declared policy . . . ."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,

15  20 Cal. 4th 163, 180, 186-87 (1999); *Swanson v. EMC Mortg. Corp.*, No. CV F 09-1507 LJO

16  DLB, 2009 WL 4884245, at *9 (E.D. Cal. Dec. 9, 2009).  "[T]he 'unfairness' prong has been

17  used to enjoin deceptive or sharp practices . . . ."  *Countrywide Fin. Corp. v. Bundy*, 187 Cal.

18  App. 4th 234, 257 (2010) (internal citation & quotation omitted).

19       "The FAL makes it unlawful to induce the public to enter into any obligation

20  through the dissemination of 'untrue or misleading' statements."  *In re Clorox Consumer Litig.*,

21  894 F. Supp. 2d 1224, 1231 (N.D. Cal. 2012) (quoting CAL. BUS. & PROF. CODE § 17500).

22       As the court has found plaintiffs may be able to replead the ILSA claim, plaintiffs

23  also may be able to replead their UCL and FAL claims.  They will be allowed to include these

24  claims in any amended complaint.

25       C.  Rescission

26       To the extent that plaintiffs rely on the underlying fraud as a basis for their

27  rescission claim, its viability is linked to the discussion of the fraud causes of action above.

28  However, as plaintiffs have not sufficiently pleaded delayed discovery, the court cannot

16

1   determine the ultimate viability of the rescission claim.  Upon amendment, the court may revisit

2   this question.

3         D.   Antitrust Claims

4              i.  Statute of Limitations

5              A four year statute of limitations governs federal antitrust violations and begins to

6   run on the date the defendant commits the act that injures another.  *Varner v. Patterson Farms*,

7   371 F.3d 1011, 1019 (8th Cir. 2004); 15 U.S.C. §15(b).  When a plaintiff alleges that an

8   agreement is an illegal tying agreement, he must bring suit within four years after the agreement

9   was executed, as a general rule.  *Bass v. Boston Five Cent Savings Bank,* 478 F. Supp. 741, 747

10  (D. Mass. 1979).  "A cause of action, however, does not necessarily 'accrue' when the defendant

11  commits the act causing plaintiff's injury but may be tolled until the plaintiff discovers or should

12  have discovered the injury.  For instance, acts of fraudulent concealment by the defendant toll the

13  limitations period for so long as the concealment continues."  *In re Scrap Metal Antitrust Litig.*,

14  527 F. 3d 517, 536 (6th Cir. 2008); *Battle v. Liberty Nat' Life Ins. Co*, 493 F. 2d 39, 52 (5th Cir.

15  1974).

16             California's Cartwright Act also is governed by a four year statute of limitations.

17  *Stanislaus Food Prod. Co. v. USS-POSCO Indus*., CV F 09-0560 LJO SMS, 2010 WL 3521979,

18  at *13 (E.D. Cal. Sep. 3, 2010); Cal. Bus. & Prof. Code § 16720, *et seq.*  This period also is

19  subject to tolling.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. M 07–1827 SI, C 12–3802

20  SI, 2013 WL 1164897, at *4 (N.D. Cal. Mar. 20, 2013).

21             As noted above, plaintiffs have not sufficiently pleaded delayed discovery under

22  either federal or state law, but will not be given leave to amend; as explained below, they have

23  not stated a claim for violating either the Sherman or Cartwright Acts and amendment would be

24  futile.

25             ii.  Failure to State a Claim

26             Under federal law, "[a] tying arrangement is 'an agreement by a party to sell one

27  product but only on the condition that the buyer also purchases a different (or tied) product, or at

28  least agrees that he will not purchase that product from any other supplier.'"  *Eastman Kodak*

1   *Co. v. Image Technical Servs., Inc*. 504 U.S. 451, 461 (1992) (quoting *Northern Pacific R. Co. v.*

2   *United States*, 356 U.S. 1, 5-6 (1958)).  "A tying arrangement will constitute a per se violation of

3   the Sherman Act if the plaintiff proves that 'the defendant tied together two distinct products or

4   services; (2) that the defendant possesses enough economic power in the tying product market to

5   coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a

6   not insubstantial volume of commerce in the tied product market.'"  *Brantley v. NBC Universal,*

7   *Inc.*, 675 F.3d 1192, 1197 n.7 (9th Cir.) (quoting *Cascade Health Solutions v. Peace-Health*,

8   515 F.3d 883, 913 (9th Cir. 2008)).

9          Similarly, under the Cartwright Act, "[a] tie-in (or tying arrangement) is a

10   requirement that a buyer purchase one product or service as a condition of the purchase of

11   another."  *Classen v. Weller*, 145 Cal. App. 3d 27, 36 (1983).  "An anti-trust complaint predicated

12   on an illegal per se tying arrangement must allege that: (1) a tying agreement, arrangement, or

13   condition existed whereby the sale of the tying product was linked to the sale of the tied product

14   or service; (2) the party had sufficient economic power in the tying market to coerce the purchase

15   of the tied product; (3) a substantial amount of sale was effected in the tied product; and (4) the

16   complaining party sustained pecuniary loss as a consequence of the unlawful act."  *Id.* at 37-38.

17   California courts look to cases interpreting the Sherman Act for guidance in interpreting the

18   Cartwright Act.

19          Plaintiffs allege that Lennar is the largest homebuilder in the nation and the largest

20   single homebuilder and home seller in Northern California, including the greater Sacramento area

21   and Yuba County.  ECF No. 33 ¶ 107.  Plaintiffs have not, however, sufficiently described

22   Lennar's market power, as even the largest single homebuilder may exercise control over a small

23   portion of the market, depending on the number and nature of its competitors.  *See Western*

24   *Wholesale Supply, Inc. v. Holladay,* No. Civ. 97-0297 S-BLW, 2000 WL 33716996 at *14 (D.

25   Idaho Feb. 29, 2000) ("Western does proffer Wayne-Dalton advertisements stating that Wayne-

26   Dalton is the largest manufacturer of garage doors in the nation. This could mean that Wayne-

27   Dalton (1) bestrides the industry as the Microsoft of garage doors, (2) anxiously leads a pack of

28   competitors by the slimmest of margins, or (3) is somewhere between (1) and (2). This is a huge

1   continuum, and to place Wayne-Dalton anywhere along it--with only evidence that it is the largest

2   manufacturer in the nation---requires gross speculation . . . ."); *nSight, Inc. v. PeopleSoft, Inc.*

3   No. C–04–3836MMC, 2005 WL 3299164, at *1 (N.D. Cal. Aug. 1, 2005) (finding

4   characterization of defendant as largest consulting firm on PeopleSoft applications insufficient to

5   show monopoly power), *aff'd*, 206 F. App'x 55 (9th Cir. Oct. 7, 2008).  As defendants observe,

6   plaintiffs themselves say they "could have bought from anyone but . . . happened to buy from

7   Lennar."  ECF No. 33 ¶ 63.  Given this concession, that there was no "relative difficulty of

8   obtaining a comparable home in the relevant market," plaintiffs will not be able to amend

9   consonant with Rule 11.

10          E.  Violation of the CC&Rs

11          Plaintiffs allege that defendants breached the CC&Rs by failing to maintain the

12   lots, keep the structures uniform and the community free of business activity, and also by failing

13   to complete the subdivision improvements and abandoning the subdivision in such a condition

14   that it causes a nuisance.

15          Defendants have asked the court to take judicial notice of the CC&Rs, specifically

16   those provisions that give Lennar "the right to alter its construction and development plans and

17   designs as it deems appropriate . . ." without any obligation "to build out the Development in any

18   particular manner or at all," ECF No. 37-1 at 11 ¶ 5.04, and the right to do "on any Lot owned by

19   them whatever they deem necessary to advisable in connection" with the construction of units.

20    ECF No. 37-2 at 11 ¶ 5.01.  The CC&Rs do provide that the property shall be "held, sold, and

21   conveyed" or "held, conveyed, hypothecated [and] encumbered" subject to the restrictions set

22   forth in the documents and shall bind the parties having or acquiring the properties.  ECF No.

23   37-2 at 1 ¶ C; ECF No. 37-1 at 4 ¶ B.  Defendants have not identified any portion of the CC&Rs

24   covering Rio Del Oro that exempts defendants from the provisions against maintaining a business

25   or creating a nuisance, as these provisions are not restricted to owners of the lots.  *See, e.g.,* ECF

26   No. 37-2 at 3 ¶ 2.01.  In contrast, the CC&Rs for River Oaks East[1] specifically exempt defendants

27

28
─────────────────
[1]  The parties do not identify whether River Oaks East is part of Rio Del Oro or Estancia Estates, but they do not dispute that these CC&Rs cover one of the developments at issue.

from the prohibition against business activity. ECF No. 37-1 at 5 ¶ 2.01.  The CC&Rs do impose a general duty of maintenance, which appears to extend to unsold and undeveloped lots.  *See* ECF No. 37-2 at 4 ¶ 2.06; ECF No. 37-1 at 7 ¶ 2.12. Accordingly, to the extent this claim is premised on an obligation to complete the subdivisions, it is dismissed without leave to amend.

     IT IS THEREFORE ORDERED that

      1. Defendants' motion to dismiss based on the statute of limitations is granted without prejudice as to plaintiffs' ILSA, UCL and FAL claims;

      2. Defendants' motion to dismiss as to plaintiffs' Sherman Act and Cartwright Act claims is granted with prejudice;

      3. Defendants' motion to dismiss as to the claimed violation of the CC&Rs is granted in part and denied in part; and

      4. Plaintiffs' Third Amended Complaint is due within twenty-one days of the date of this order.

DATED:  September 10, 2013.

_____
UNITED STATES DISTRICT JUDGE