UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD W. IRVING, et al., | No. 2:12-CV-0290 KJM EFB |
| Plaintiffs, | |
| v. | ORDER |
| LENNAR CORPORATION, et al., | |
| Defendants. | |

Defendants' motion to dismiss plaintiffs' Third Amended Complaint ("TAC") is pending before the court. The court ordered the motion submitted on the pleadings and now DENIES it.

I. BACKGROUND

On February 27, 2012, plaintiffs Donald Irving, Fammie Holmes-Irving, Chandresh Bhakta, Tina Bhakta, John Carreras, Isidro Escareno, Dennis Frantom, Dan Lewerenz, Rui Lopes, Rose Lopes, Alfredo Lorica, Eugenia Lorica, Dan Masciovecchio, Greg Peterson, Olga Peterson, E. Scott Coelho, Valerie Salazar, Themis Sakellarious, Jimmy Turner, Sharon Turner, Greg Weasel, Virginia Weitzel, Christopher White, Monique White, Thomas Williams and Makeiba Scott (collectively "plaintiffs") filed a First Amended Complaint ("FAC"), alleging six causes of action stemming from defendants' alleged acts and omissions in connection with the Estancia Estates and Legends in Rio Del Oro communities, in the Plumas Lake Subdivision in

1

1  Yuba County: (1) violation of the Interstate Land Sales Act ("ILSA") by means of untrue
2  statements in the sale of subdivided lots, 15 U.S.C. § 1703; (2) unfair competition and business
3  practices ("UCL"), CAL. BUS. & PROF. § 17200; (3) false and misleading advertising or
4  statements in the sale of real property ("FAL"), CAL. BUS. & PROF. § 17500; (4) rescission based
5  on fraud or mistake, CAL. CIV. CODE § 1689; (5) RICO violations, 18 U.S.C. §§ 1961, *et seq*.;
6  (6) Sherman Act and California anti-trust violations, 15 U.S.C. § 1 & CAL. BUS. & PROF. CODE
7  § 16700, *et seq*.; and (6) violation of the Covenants, Conditions and Restrictions ("CC&Rs") for
8  both developments.  ECF 7.

9        On March 26, 2012, Lennar Corporation ("Lennar"), Lennar Renaissance, Inc.
10 ("Renaissance), Lennar Sales Corporation ("Sales"), and Universal American Mortgage Company
11 of California ("UAM") (collectively "defendants") filed a motion to dismiss the First Amended
12 Complaint.  The court denied the motion as to the claim that defendants violated the Covenants,
13 Conditions and Restrictions (CC&Rs) and granted the motion as to the other claims, giving
14 plaintiffs leave to amend as to the fraud, rescission, UCL, Sherman Act and Cartwright Act
15 claims.  ECF No. 36.

16        On April 19, 2013, plaintiffs filed their Second Amended Complaint (SAC),
17 raising the following claims:  (1) an ILSA violation based on untrue statements in the sale of
18 subdivided lots, 15 U.S.C. § 1703; (2) an UCL claim, based on defendants' alleged manipulation
19 of market values and false and misleading misrepresentations, CAL. BUS. & PROF. CODE § 17200;
20 (3) a claim of false and misleading advertising or statements in the sale of real property, CAL.
21 BUS. & PROF. CODE § 17500; (4) a claim for rescission based on fraud or mistake, CAL. CIV.
22 CODE § 1689; (5) Sherman Act and Cartwright Act violations, 15 U.S.C. § 1 & CAL. BUS. &
23 PROF. CODE § 16700, *et seq*.; and (6) a claim for a violation of the CC&Rs.  ECF 33.

24        On May 13, 2013, defendants filed a motion to dismiss the Second Amended
25 Complaint, alleging generally that all the claims were barred by the statute of limitations and that
26 plaintiffs failed to state a claim as to any of their causes of action.  ECF 36.

27        On September 11, 2013, the court granted the motion, giving plaintiffs leave to
28 amend their claims under the ILSA, UCL and FAL but dismissing without leave to amend the

2

Sherman and Cartwright Act Claims and that portion of the claimed violation of the CC&Rs based on an obligation to complete the subdivision.

Plaintiffs filed the Third Amended Complaint on October 1, 2013.

II. ALLEGATIONS OF THE THIRD AMENDED COMPLAINT

Plaintiffs allege the following facts in their Third Amended Complaint. Defendants are in the business of developing, constructing, marketing, selling, and financing new homes. TAC, ECF 47 ¶ 15. Sometime before 2007, defendants expanded their business so they not only built houses, but also marketed them to prospective buyers and provided buyers with financing, appraising, and title services. *Id.* ¶ 17. To that end, Lennar formed Renaissance, Sales and UAM. Collectively these entities worked together to keep major aspects of the sale within their control by providing "easy money" not otherwise available in the market to finance the home purchases; this allowed them to increase or decrease incentives for the purchases at their whim and also allowed them to increase the home prices. Ultimately Lennar controlled every aspect of the sale of homes to plaintiffs. *Id.* ¶¶ 18, 19, 43.

In 2006 and 2007, plaintiffs purchased homes in Lennar's Estancia Estates and Legends at Del Rio in reliance on defendants' representations and the information provided as part of defendants' fraudulent scheme of market manipulation. "A Lennar subsidiary would build the homes, a Lennar subsidiary would market them, a Lennar subsidiary would act as broker, a Lennar subsidiary would be the seller, and a Lennar subsidiary would provide financing to the buyers," while "a Lennar-friendly appraiser would appraise the properties for UAM with artificially inflated values thereby deceiving Plaintiffs to purchase the homes with the supposed 'incentives' which really did not even support the sale of the homes to Plaintiffs at current market value." *Id.* ¶¶ 1, 23, 43. Plaintiffs also relied on defendants' commitment to complete the subdivisions, which were developed on farmland, away from existing suburbs and urban areas. *Id.* ¶¶ 23, 42.

Each of these early buyers was required to have exceptional credit and had to provide a large down payment; each was told that subsequent buyers would have to meet the same requirements. *Id.* ¶ 48. Defendants thereafter assisted unqualified buyers to purchase

3

houses, leading eventually to foreclosures and short sales, with a corresponding impact on the value of plaintiffs' homes. *Id*. ¶¶ 49-50, 54.

Although each plaintiff's account varies slightly, each alleges generally that defendants' New Home Consultants ("Consultants") informed prospective buyers that if they used defendant UAM, who would provide an "everything included" loan, the buyers would receive significant financial incentives, which in fact made the purchases feasible for the plaintiffs. The Consultants provided Community Maps, which described the phases of construction, including the planned parks, common areas, and roads; gave the plaintiffs "purchase agreements and deposit receipts," which said funds would not be released from escrow until the common areas and improvements in that particular phase had been completed; imposed CC&Rs that restricted development to a community free of nuisance with homes to be occupied by single families in a safe suburban neighborhood; and provided a Department of Real Estate ("DRE") Report, which stated defendants intended to sell all the lots in the communities, that buyers would be required to sign an occupancy agreement requiring them to live in the houses for at least a year, and that defendants would complete construction of the planned streets. In addition, the Consultants told plaintiffs that subdivision improvements would be completed in a short period of time; that if buyers did not use UAM financing they would lose significant financial incentives; that defendants would not sell to investors; and that the price set for the houses was the true value of the properties. *Id*. ¶¶ 24-40. Other oral representations included claims that at least one community would have a park, grocery store and professional building. *Id*. ¶¶ 26-40.

As part of their scheme, defendants provided that only buyers of Lennar homes could use UAM and only UAM could provide discount incentives on the homes. *Id*. ¶ 42. As a result, plaintiffs purchased houses at artificially inflated prices and paid artificially high prices for defendants' other products, such as financing, title services and appraisal services, with the assurance that the home values would continue to rise. *Id*.

Despite the Consultants' assurance that defendants would sell only to buyers who intended to live in the homes, defendants marketed the houses to investors and to buyers who posed an abnormally high risk of foreclosure. *Id*. Defendants' representatives encouraged buyers

1  to provide inflated and unverified income information, underwrote sub-prime loans for people
2  with bad credit, did not require substantial down payments, provided incentives to cover closing
3  costs, and used inflated appraisals. *Id.* ¶ 50. Because the buyers used UAM, defendants were
4  aware that certain buyers were not qualified to purchase their homes. *Id.* ¶ 52. Nevertheless,
5  because these loans were securitized, Lennar did not absorb the losses stemming from
6  foreclosures. *Id.* ¶ 45. The value of plaintiffs' homes decreased, however, when the homes sold
7  to unqualified buyers were foreclosed or became subject to short sale. *Id.* ¶ 49. Moreover,
8  defendants should have known that prospective purchasers would want to know if the
9  surrounding homes were being sold to people at high risk for foreclosure, but they did not provide
10 this material information or otherwise disclose the high number of sub-prime loans issued for the
11 subdivisions. *Id.* ¶¶ 57-58. As a result of the foreclosures, short sales and sales to investors,
12 many lots in the subdivisions are unkempt, houses are being occupied by multiple families or by
13 transients, and crime has increased. *Id.* ¶ 56.

14       In addition, as part of the scheme, defendants falsely promised they would provide
15 and then maintain safe and secure neighborhoods and fully developed communities consisting of
16 a defined number of completed homes, supported by the promised infrastructure, including parks,
17 recreation facilities, retail outlets and professional spaces; at the time plaintiffs purchased the
18 homes, the area was undeveloped and not supported by adequate public, private, commercial,
19 retail and other services. *Id.* ¶¶ 60, 62-65.

20       Finally, defendants have violated the CC&Rs, which require owners to maintain
21 their homes, and prohibit the creation of a nuisance. *Id.* ¶¶ 66-68.

22       Plaintiffs allege they discovered the fraud, misrepresentation and unlawful acts
23 within three years before the original complaint was filed. *Id.* ¶ 71. Specifically, they did not
24 learn about the sale to unqualified buyers and investors nor did they have reason to investigate
25 until several houses had posted foreclosure notices and "for sale" signs appeared in the
26 subdivision. *Id.* ¶ 71a. Specifically, plaintiffs Irving, Carreras, Lewerenz, Lopes, Masciovecchio,
27 Peterson, Kakellarious, Salazar, Turner, Valentine, White and Williams/Scott began to notice
28 foreclosure and sale signs beginning in the summer of 2009 while the remaining plaintiffs did not

notice such signs until 2011. As they were not privy to the sales agreements with the other buyers, they did not know about the sales to unqualified buyers and investors, until the "for sale" signs caused them to investigate. *Id.* ¶ 71a. They did not learn their suspicions were correct until just before the lawsuit was filed. *Id.*

Plaintiffs did not realize they had purchased houses at artificially inflated prices compared to non-Lennar homes in the Sacramento area until they attempted to refinance their homes, secured appraisals from non-UAM affiliated appraisers, and learned that the prices they paid were not commensurate with comparable homes. *Id.* ¶ 71b. Plaintiffs Bhakta and Lewerenz learned after their refinance in 2009, while Williams/Scott inquired about refinancing in 2009 and were told they were "upside down." Lopes and Turner also learned about the artificially inflated prices in 2011when they refinanced. These plaintiffs subsequently told the others that their houses had been overpriced. *Id.*

Plaintiffs Bhakta, Carrera, Escareno, Irving, Lewerenz, Lopes, Lorica, Masciovecchio, O'Keefe, Peterson, Sakellariou, Salazar, Turner, Valentine, Weitzel, White and Williams/Scott each noticed that the construction trailer remained onsite, but there was no activity beginning in 2010, which prompted them to investigate whether Lennar was going to complete the promised improvements. *Id.* ¶ 71c. In 2009 and 2010, the Turners, Whites, Lewerenzes, Lopeses, Irvings and Masciovecchio became aware the model homes had been sold before the infrastructure was completed, which caused them to suspect defendants were not going to finish the subdivisions. *Id.* ¶ 71e. Plaintiff Carreras learned from subcontractors in 2009 that Lennar was not going to complete the project. *Id.* ¶ 71c. Lennar trucks stopped coming to the subdivisions in 2010, which is when all other signs of construction ceased and the unimproved lots and common areas became dumping grounds for debris and were overrun by weeds. *Id.* In 2012, the construction trailer was removed from the subdivision. *Id.*

Finally, plaintiffs allege that just before filing the initial complaint, the plaintiffs learned Lennar had taken money from escrow without completing the construction of improvements and common areas. *Id.* ¶ 71d.

/////

The Third Amended Complaint contains four claims for relief: (1) violation of the Interstate Land Sales Act, 15 U.S.C. § 1703(a)(2)(B); (2) violation of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200; (3) violation of California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500 ("FAL"); and (4) rescission based on fraud or mistake, CAL. CIV. CODE § 1689.

III. STANDARD FOR A MOTION TO DISMISS

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." A court may dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A motion to dismiss under this rule may also challenge the sufficiency of fraud allegations under the more particularized standard of Rule 9(b) of the Federal Rules of Civil Procedure. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003).

Although a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), in order to survive a motion to dismiss this short and plain statement "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must include something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint will survive a motion to dismiss for failure to state a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Ultimately, the inquiry focuses on the interplay between the factual allegations of the complaint and the dispositive issues of law in the action. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

In making this context-specific evaluation, this court must construe the complaint in the light most favorable to the plaintiff and accept as true the factual allegations of the complaint. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). This rule does not apply to "'a legal

conclusion couched as a factual allegation,'" *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (quoted in *Twombly*, 550 U.S. at 555), nor to "allegations that contradict matters properly subject to judicial notice" or to material attached to or incorporated by reference into the complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir. 2001).

A district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006). The Ninth Circuit has explained that such reliance is permissible when "plaintiff's claim depends on the contents of a document" that is not attached to the complaint. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Defendants have provided copies of the CC&Rs for both developments; as plaintiffs' complaint relies on these, the court may properly consider them in resolving the motion to dismiss.

Finally, a party may raise a statute of limitations argument in a motion to dismiss if it is apparent from the face of the complaint that the complaint was not timely filed and that plaintiff will be unable to prove facts to establish the timeliness of the claim. *Von Saher v. Norton Simon Museum*, 592 F.3d 954, 969 (9th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S. Ct. 3055 (2011); *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995). Plaintiffs allege they purchased their houses between 2006 and 2007; defendants contend that the claims are barred by the statute of limitations and that plaintiffs have not adequately pleaded delayed discovery.

IV. ANALYSIS

   A. Statute of Limitations

Plaintiffs have pleaded claims under the Interstate Land Sales Act ("ILSA") and California's Unfair Competition and False Advertising Laws ("UCL" and "FAL"). Under the anti-fraud provisions of ILSA, "no action shall be maintained . . . [¶] more than three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2). For the UCL and FAL claims, the statute of limitations is

8

four years.  *CytoSport, Inc. v. Vital Pharm., Inc.*, 894 F. Supp. 2d  1285, 1295 (E.D. Cal. 2012); *Cortez v. Purolator Air Filtrations Prod. Co.*, 23 Cal. 4th 163, 178 (2000); CAL. CIV. CODE § 17208.

Federal and California courts recognize that the statute of limitations is subject to the "discovery rule."  Under this rule the statute of limitations begins to run only when a plaintiff knows the "'critical facts' of his injury, which are 'that he has been hurt and who has inflicted the injury.'"  *Bibeau v. Pac. Nw. Research Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999), *amended on denial of rehearing*, 208 F.3d 831 (9th Cir. 2000) (quoting *United States v. Kubrik*, 444 U.S. 111, 122 (1979)); *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 130 S. Ct. 1784, 1793-94 (2010) (describing the "discovery rule" as a "doctrine that delays accrual to a cause of action until a plaintiff has 'discovered' it" and noting that fraud is "discovered" when it could have been discovered in the exercise of diligence).  The discovery rule incorporates a diligence requirement, for if a plaintiff is not diligent in discovering the critical facts, he or she will not be able to bring suit after the statute of limitations has run.  *Bibeau*, 188 F.3d at 1108.  Nevertheless, the limitations period will not begin "upon mere suspicion of the elements of a claim."  *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 147-48 (9th Cir. 2002).

In California,  a party is deemed to have discovered the fraud when it "'has reason at least to suspect the factual basis for its elements.'"  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) (quoting *Norgart v. The Upjohn Co.*, 21 Cal. 4th 383, 398 (1999)).  This rule "delays accrual until the plaintiff has, or should have, inquiry notice of the cause of

/////
/////
/////
/////
/////
/////
/////
/////

9

action." *Id.* A court engages in a two-part analysis in determining whether a claim has accrued under this rule:

> The initial step focuses on whether the plaintiff possessed information that would cause a reasonable person to inquire into the cause of his injuries. Under California law, this inquiry duty arises when the plaintiff becomes aware of facts that would cause a reasonably prudent person to suspect his injuries were the result of wrongdoing. If the plaintiff was in possession of such facts, thereby triggering his duty to investigate, it must next be determined whether such an investigation would have disclosed the factual basis of a cause of action [.] [T]he statute of limitations begins to run on that cause of action when the investigation would have brought such information to light.

*Alexander v. Exxon Mobil*, 219 Cal. App. 4th 1236, 1250-51 (2013) (internal citation, quotation omitted; alteration in original); *see also Fox*, 35 Cal. 4th at 808 n.2 ("At common law, the term 'injury,' as used in determining the date of accrual of a cause of action means both a person's physical condition *and* its negligent cause." (internal citation and quotation omitted; emphasis in original)). A party relying on the delayed discovery rule must plead facts showing the time and manner of the discovery and the inability to have made earlier discovery despite reasonable diligence; conclusory allegations are not sufficient. *E-Fab, Inc. v. Accountants, Inc., Servs.*, 153 Cal. App. 4th 1308, 1319 (2007).

Defendants argue plaintiffs have not adequately alleged their individual discovery of the alleged fraud and, even if the discovery is individually pleaded, the widespread publicity in 2006 and 2007 concerning the housing downturn means that "a reasonable homebuyer would . . . have been on notice far earlier that her home value was 'upside down.'" Mot. to Dismiss, ECF 48 at 16.

Even assuming it is proper for this court to take judicial notice of the news articles defendants have provided, they do not defeat plaintiffs' reliance on delayed discovery, because "[t]he mere fact of publicity . . . does not conclusively show that a plaintiff must be imputed with knowledge." *Migliori v. Boeing N. Am., Inc.*, 97 F. Supp. 2d 1001, 1011 (C.D. Cal. 2000); *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1134, 1143 n. 17 (C.D. Cal. 2010) (recognizing that while publicity may be relevant at the summary judgment stage, the inquiry into the discovery of a claim "'is a question of fact unless the evidence can support only one reasonable interpretation'"

10

(quoting *Ovando v. County of Los Angeles*, 159 Cal. App. 4th 42, 61 (2008))); *Unruh-Haxton v. Regents of University of Cal.*, 162 Cal. App. 4th 343, 363-64 (2008) (rejecting claim that publicity gave rise to constructive knowledge when plaintiff did not admit knowledge of the coverage). Moreover, because "the determination of whether a reasonable person would have discovered the information depends on various factors," including "the characteristics of the plaintiffs," the inquiry is "best left to a proceeding where both sides can present evidence on the issue." *Migliori*, 97 F. Supp. 2d at 1011-13; *see Hamilton Materials, Inc. v. Dow Chemical Co.*, 494 F.3d 1203, 1227 (9th Cir. 2007) (on summary judgment finding that a "sophisticated manufacturer of asbestos" would have been on notice by publicity about product's health hazards that defendant's claim about it was false).

Moreover, even if the publicity surrounding the collapse of the housing industry might have caused homeowners to fear they were under water, the news did not necessarily suggest the injury was the result of defendants' alleged fraud. *See generally Bibeau*, 188 F.3d at 1108 (observing that critical fact for purposes of delayed discovery doctrine was when plaintiff should have been aware he was injured by particular experiments; that he knew he was suffering a variety of health problems did not necessarily mean he should have associated them with the particular experiments); *Hendrix v. Novartis Pharm. Corp.*, ___ F. Supp. 2d ___, 2013 WL 5491846, at *5 (C.D. Cal. Oct. 2, 2013) ("The discovery rule does not trigger accrual of a cause of action unless the plaintiff has some reason to suspect *wrongdoing*; that is, when plaintiff, through reasonably diligent investigation, discovers only that he has been injured, but not that the injury may have a wrongful cause, then the clock has not yet begun to run." (emphasis in original)). In this case, plaintiffs have pleaded in essence they were not aware that any injury was caused by wrongdoing until 2009, when several of them attempted to refinance and then those plaintiffs told the others. They also allege they did not understand that the decline in the prices of their houses was the result of wrongdoing until 2010 when they noted Lennar trucks were no longer coming to the subdivisions and the construction trailer was abandoned, and until they

11

became aware of the "for sale" and "for rent" signs.[1]  Thereafter they undertook an investigation leading to this suit, which was not undertaken earlier because even if they were aware of the reduced value of their homes, they did not suspect the cause.

Finally, plaintiffs have adequately differentiated the dates on which they discovered their respective injuries, as described above.  Several discovered defendants' alleged fraud when they secured independent appraisals in connection with refinancing and these in turn informed the other plaintiffs.   One plaintiff learned in 2009 that Lennar had abandoned the subdivisions, while others noticed the cessation of construction and consequent neglect of the undeveloped lots in 2010, followed by the closing of the construction trailer.  None of the plaintiffs learned that Lennar had taken money from escrow before completing the promised infrastructure until he or she consulted counsel in 2012.[2]  The ILSA, UCL and FAL claims may proceed.

B.  Puffery

In the prior order, the court found that plaintiffs' fraud claims relied in part on puffery, to the extent they were based on statements that Lennar was a stable builder committed to the neighborhood and the neighborhood would be safe and stable because defendants were not selling to speculators or high risk investors. ECF 44 at 13-14.

---

[1] Defendants suggest plaintiffs' allegations are not plausible because some of the plaintiffs noticed "for sale" and "for rent" signs earlier than others. "Plausibility" under *Iqbal* "does not require the Court to determine the *likelihood* of the facts alleged but rather to determine whether the factual allegations pled in support of that claim are *sufficient* to render the claim plausible." *Barnard v. Suntrust Bank*, Civ. No. 1:11-cv-000289 MR, 2013 WL 546 0291, at *6 (W.D.N.C. Sep. 30, 2013) (emphases in original); *Ouilette v. Lee*, No. 3: 12-cv-00587-RCJ-VPC, 2013 WL 3729162, at *3 (D. Nev. Jul. 9, 2013) (resolving pretrial motions is not a fact-finding endeavor, requiring the court to guess at the likelihood of the truth).

[2] Defendants argue plaintiffs should have realized the money was taken from escrow when title was conveyed to them, because the purchase agreements provided that there would be no conveyance until the improvements to the subdivisions were completed.  *See, e.g.*, Request for Judicial Notice, ECF 49-1 at 2.  The provisions of the Purchase Agreements regarding the release of funds from escrow impose a number of conditions precedent to the release, including the completion of common facilities and improvement, "as evidenced by a  Notice of Completion . . . being recorded . . ." *Id*.  Even assuming there is sufficient information in the record showing when title was conveyed to these plaintiffs, it is not clear this would put them on inquiry notice in the absence of the Notice of Completion.

In the current motion, defendants argue that plaintiffs' allegation that defendants claimed to be selling only to well-qualified buyers who would live in the subdivision and not to high risk investors is also puffery based on the court's previous order. ECF 48 at 17. Plaintiffs counter that defendants are misreading the order. ECF 50 at 15.

"[T]he difference between a statement of fact and mere puffery relies in the specificity or generality of the claim." *Newcal Indus., Inc. v. IKON Office Solutions*, 513 F.3d 1038, 1053 (9th Cir. 2008); *Stickrath v. Gobalstar, Inc.*, 527 F. Supp. 2d 992, 998-99 (N.D. Cal. Sep. 25, 2007) (finding a claim that product used brand-name components was not puffery because it was a factual representation that could be proved or disproved during discovery). To constitute an affirmative misrepresentation, a statement must make a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Coastal Abstract Serv. v. First Am. Title Ins. Co*, 173 F.3d 725, 731 (9th Cir. 1999). In the earlier order, the court found plaintiffs' claim that defendants promised safe and secure neighborhoods to be non-actionable; it did not say that defendants' alleged promise not to sell to high risk investors was puffery, and does not so find now. ECF No. 44 at 13-14 (saying only that the claim Lennar was selling to high risk investors did not take claim of safe, stable neighborhoods out of realm of puffery, but not addressing that claim by itself); *see In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (finding actionable company's claims of having loans of "higher credit quality" and a strategy of choosing borrowers with increasing credit scores when complaint included information about high risk loans provided to less qualified borrowers).

      C.   Fraud and the Purchase Agreements

Defendants argue that plaintiffs cannot plead reliance on oral representations because they are contradicted by judicially noticeable documents. Specifically, defendants target the following claims: (1) plaintiffs could purchase the homes only by using UAM financing; (2) Lennar would complete the infrastructure regardless of market conditions; and (3) that the homes would be occupied by qualified buyers who would live in them for at least a year. They argue plaintiffs could not reasonably have relied on any oral representations because of the clear

13

language in the purchase agreements contradicting plaintiffs' description of the oral representations. They ask the court to take judicial notice of the purchase agreements, observing that plaintiffs have referred to the agreements in describing defendants' alleged misrepresentations.[3]

Plaintiffs argue correctly that defendants mischaracterize the Third Amended Complaint, which does not say that plaintiffs were told they were required to use UAM financing and that Lennar would complete the subdivision no matter what the market conditions. *See* Opp'n, ECF 50 at 17. According to the complaint, many of the plaintiffs believed they could afford the houses only because of the illusory incentives offered by UAM. *See, e.g.*. ECF 47 ¶ 24 (stating that the illusory incentives offered by UAM provided the means for plaintiffs to purchase the homes).

Even adopting defendants' reading of the complaint, defendants' reliance on the purchase agreements is unavailing. As plaintiffs argue, plaintiffs base their claims of fraud not on what the purchase agreement provided, but rather what the New Home Consultants told them. These claims are not precluded by any contradictions in the contracts. Moreover, both California and federal courts have said that reliance may be based on oral representations even when they are contradicted by written instruments. *See Thrifty Payless, Inc. v. Americana AT Brand LLC*, 218 Cal. App. 4th 1230 (2013) ("[E]xtrinsic evidence is admissible to establish fraud or negligent representation in the face of the lease's integration clause"; also finding reliance reasonable because of the defendant's superior knowledge and information about the space leased to plaintiff); *In re Facebook PPC Adver. Litig.*, Nos. 5:09–cv–03043–JF, 5:09–cv–03519–JF, 5:09–cv–03430–JF, 2010 WL 5174021, at *8 (N.D. Cal. Dec. 15, 2010) (stating that a fraud claim could survive even in the face of contract terms when those terms were not obfuscated by other representations); *Garcia v. Sony Computer Entm't Am. LLC*, 859 F. Supp. 2d 1056, 1062 (N.D.

/////

---

[3] In resolving the motion to dismiss the First Amended Complaint, the court declined to take judicial notice of these agreements because the complaint did not depend on the documents. ECF 31 at 14. Plaintiffs have amended their complaint, referencing the purchase agreements. Judicial notice thus is appropriate at this time. *Knievel v. ESPN*, 393 F.3d at 1076.

Cal. 2012) (under the UCL, court considers whether the alleged deceptive conduct would mislead or deceive members of the public).

### D. Fraud and Specificity

Under Rule 9(b), a plaintiff who alleges fraud "must state with particularity the circumstances constituting the fraud," but may "aver[] generally" the state of mind animating the fraud. The pleading must "'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" *Sanford v. Memberworks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)); *Neubronner v. Milken*, 6 F.3d 666, 671-72 (9th Cir. 1993) ("A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." (internal quotation marks and citation omitted)). To avoid dismissal, the complaint must describe the time, place, and specific content of the false representations and identify the parties to the misrepresentations. *Kearns*, 567 F.3d at 1124. When fraud is the basis of a claim under California's false advertising or unfair competition laws or under the ILSA, the pleading requirements of Rule 9(b) govern. *In re Sony Grand Wega KDF-E A10/20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1093 (S.D. Cal. 2010) (FAL); *Rogers v. Wesco Prop.*, No. CV 09–08149–PCT–MHM, 2010 WL 3081352, at *5 (D. Ariz. Aug. 4, 2010) (ILSA); *Rodriguez v. JP Morgan Chase & Co.*, 809 F. Supp. 2d 1291, 1297 (S.D. Cal. 2011) (UCL).

Defendants argue plaintiffs have not specified what is fraudulent about the flyers attached as exhibits to the Third Amended Complaint or about the "mock-ups" showing the completed subdivision. ECF 48 at 24. However, as plaintiffs note, in the prior order, the court found plaintiffs adequately pleaded what was fraudulent about the second flyer. ECF 44 at 12. In the Third Amended Complaint, they describe the first flyer's promise of incentives as fraudulent because the incentives mentioned in the flyer were illusory. They similarly describe mock-ups showing completed subdivisions, "which contributed to [plaintiffs'] belief that Defendants would complete the Subdivision and infrastructure . . . ." TAC ¶ 24 at 11:21-28.

15

These allegations do not plead a different species of fraud, but rather illustrate the defendants' alleged scheme.

E.  FAL Claim

Defendants contend that neither of the flyers plaintiffs have presented nor the mock-up and other materials showing the design for the completed subdivision violate the FAL because none of this material was likely to deceive the public.  ECF 48 at 26.

Under California's False Advertising Law, a party may not disseminate a communication that is "untrue, misleading, and which is known, or which by the exercise of reasonable care should be known to be untrue and misleading."  CAL. BUS. & PROF. CODE § 17500.  This statute has been broadly construed to include statements that are true but that have the likelihood of misleading the general public.  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002).  Generally, whether a practice is deceptive or misleading "must be judged by the effect it would have on the reasonable consumer."  *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1161 (9th Cir. 2012).  "'Whether consumers have been or will be misled is a factual question that cannot be resolved on a motion to dismiss.'"  *Brewer v. Indymac Bank*, 609 F. Supp. 2d 1104, 1124 (E.D. Cal. 2009) (quoting *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1037 (C.D. Cal. 1998)).  Plaintiffs have presented enough information in the complaint suggesting that illusory incentives and representations of a completed community might have deceived a reasonable consumer to survive a motion to dismiss.

IT IS THEREFORE ORDERED that defendants' motion to dismiss, ECF 48, is DENIED.  Defendants shall file their answer to the Third Amended Complaint within twenty-one (21) days.

Dated:  January 6, 2014.

_____
UNITED STATES DISTRICT JUDGE