GLEN A. VAN DYKE, ESQ., SBN: 183796
**VAN DYKE LAW GROUP**
**A Professional Corporation**
12277 Soaring Way, Suite 300
Truckee, California 96161
Telephone: (530) 587-2130
Fax        : (530) 587-2829
gvandyke@vandykelawgroup.com

MARK L. HARDY, ESQ., SBN 137770
LAW OFFICE OF MARK L. HARDY
12277 Soaring Way, Suite 300
Truckee, California 96161
Telephone: (916) 939-1070
Fax        : (916) 939-1075
Attorneys for Plaintiff
mhardy@hardyslaw.com

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD W. IRVING, FAMMIE A. HOLMES-IRVING, CHANDRESH BHAKTA, TINA BHAKTA, JOHN CARRERAS, ISIDRO ESCARENO, DENNIS FRANTOM, DAN LEWERENZ, RUI LOPES, ROSE LOPES, ALFREDO LORICA, EUGENIA LORICA, DAN MASCIOVECCHIO, GREG PETERSON, OLGA PETERSON, E. SCOTT COELHO, VALERIE SALAZAR, THEMIS SAKELLARIOU, JIMMY TURNER, SHARON TURNER, GREG WEITZEL, VIRGINIA WEITZEL, CHRISTOPHER WHITE, MONIQUE WHITE, THOMAS WILLIAMS, MAKEIBA SCOTT, | CASE NO. 2:12-CV-00290-KJM-EFB |

CASE NO. 2:12-CV-00290-KJM-EFB

**FIFTH  AMENDED COMPLAINT FOR DAMAGES**

1.      Violation of Interstate Land Sales Act Untrue Statements in the Sale of Subdivided Lots, 15 U.S.C. 1703

2.      Unfair Competition and Business Practices, B&P 17200 et Seq.

3.      False and Misleading Advertising or Statements in the Sale of Real Property, B&P Code 17500

4.      Rescission Based on Fraud or Mistake, California Civil Code Section 1689

5.      Violation of CC&Rs

Demand for Jury Trial

                    Plaintiffs,

vs.

LENNAR CORPORATION, a Delaware corporation; LENNAR RENAISSANCE, INC., a California corporation; LENNAR SALES CORP, a California corporation; UNIVERSAL AMERICAN MORTGAGE COMPANY OF CALIFORNIA, and DOES 1-300, INCLUSIVE,

                    Defendants.
_____/

Plaintiffs allege the following:

1. Plaintiffs are original purchasers of single-family homes in the Plumas Lake Subdivision (as more fully defined by 15 U.S.C. section 1701[hereinafter referred to as Subdivision]) of Yuba County, California, that were constructed in either the Estancia Estates or the Legends at Rio Del Oro communities.

2. The Plaintiffs and their addresses are as follows:

*Donald and Fammie Irving*

2032 Earhart Way, Plumas Lake, CA 95961

*Chandresh and Tina Bhakta*

1868 Broken Bit Drive, Plumas Lake, CA 95961

*John Carreras*

2071 Danforth Way, Plumas Lake, CA 95961

*Isidro Escareno*

2014 Lothland Court, Plumas Lake, CA 95961

*Dan Lewerenz*

939 Cavanaugh Court, Plumas Lake, CA 9596

*Rui and Rose Lopes*

1892 Broken Bit Drive, Plumas Lake, CA 95961

*Alfredo and Eugenia Lorica*

1875 Broken Bit Drive, Plumas Lake, CA 95961

*Dan Maschiovecchio*

1908 Broken Bit Drive, Plumas Lake, CA 95961

*Donald O'Keefe*

1406 High Noon Drive, Plumas Lake, CA 95961

*Greg and Olga Peterson*

1375 Sundance Drive, Plumas Lake, CA 95961

*Themis Sakellariou*

1880 Broken Bit Drive, Plumas Lake, CA 95961

*E. Scott Coelho and Valerie Salazar*

922 Cavanaugh Court, Plumas Lake, CA 95961

*Jimmy and Sharon Turner*

904 Chalice Creek Drive, Plumas Lake, CA 95961

*Troy Valentine*

1863 Broken Bit Drive, Plumas Lake, CA 95961

*Greg and Virginia Weitzel*

1389 High Noon Drive, Plumas Lake, CA 95961

*Christopher and Monique White*

1874 Broken Bit Drive, Plumas Lake, CA 95961

*Thomas Williams and Makeiba Scott*

906 Calabrese Way, Plumas Lake, CA 95961

Plaintiffs purchased their homes in reliance on Lennar's false and/or misleading representations as more specifically alleged below:

3.      Defendant LENNAR CORPORATION is, and at the time of construction and sale of the Plaintiffs' homes was, a corporation, incorporated in Delaware, with its principal place of business located in Miami, Florida. Lennar Corporation is, and at all times herein referenced was, registered with the California Secretary of State as entity number C1802223.  Defendant Lennar Corporation (hereinafter "Lennar Corporation" or "Lennar" or "Defendants") is, and at all times herein referenced was, the parent corporation of, and exercised control over, its affiliate corporations Lennar Renaissance, Inc., Lennar Sales Corp., and Universal American Mortgage Company of California, all Defendants named herein.

4.      Defendant LENNAR RENAISSANCE, INC. is, and at the time of construction and sale of the Plaintiffs' homes was, a corporation, incorporated in California, with its principal place of business located in Miami, Florida. Lennar Renaissance, Inc., (hereinafter included as "Defendants") is, and at all times herein referenced was, registered with the California Secretary of State as entity number C1978747. Lennar Renaissance, Inc., is, and at all times herein referenced was, the developer, builder and seller of the subject homes.

1    5.    Defendant LENNAR SALES CORP., at the time of construction and sale of the

2    Plaintiffs' homes, is a corporation, incorporated in California, with its principal place of business

3    located in Miami, Florida. Lennar Sales Corp. (hereinafter included as "Defendants") is, and at

4    all times herein referenced was, registered with the California Secretary of State as entity

5    number C2041020. Lennar Sales Corp. is, and at all times herein referenced was, an

6    affiliate/subsidiary and wholly controlled by Lennar Corporation and the only real estate broker

7    involved in the sale of the subject homes.

8    6.    Defendant UNIVERSAL AMERICAN MORTGAGE COMPANY OF

9    CALIFORNIA, is a corporation, incorporated in California, with its principal place of business

10   located in Miami, Florida. Universal American Mortgage Company of California (hereinafter

11   "UAM" or "Defendants") is, and at all times herein referenced was, registered with the

12   California Secretary of State as entity number C1900612. UAM is, and at all times herein

13   referenced was, an affiliate/subsidiary and wholly controlled by Lennar Corporation, and a

14   mortgage company for the subject homes.

15   7.    There is such a unity of interest and ownership between each of the Defendants

16   that their individual corporate personalities no longer exist; they are merely the alter egos of each

17   other. In addition, the Defendants share a common principal place of business and are located in

18   the same offices in Miami, Florida, specifically 700 NW 107th Avenue, Suite 400, Miami,

19   Florida 33172, and were jointly engaged in an enterprise to develop, market, sell, and finance

20   homes in California in violation of California and Federal law as more fully alleged herein.

21   **JURISDICTION AND VENUE**

22   8.    Plaintiffs homes, which are the subject of this action, are located in Yuba County,

23   California, in this judicial district.  As a result, venue is proper in this Court.

24   9.    This complaint alleges violation of Federal law and California law, making

25   subject matter jurisdiction proper in this Court.  The state law causes of action arise from the

26   same set of facts and circumstances, making supplemental jurisdiction over the state law causes

27   of action appropriate.  Additionally, all of the Defendants are domiciled in a state other than

28   California with the amount of damage alleged well over one million dollars, making jurisdiction

by way of diversity appropriate.

10. Plaintiffs are ignorant of the true names and capacities of Defendants, named herein as DOES 1 through 300, inclusive, whether individual, corporate, associate or otherwise. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the Defendants, sued herein as DOE, was the agent, servant, subcontractor, alter ego, and employee of his or her Co-defendants; and, in doing the things hereinafter mentioned, was acting in the scope of his or her authority as such agent, servant, and employee with the permission and consent of his or her Co-defendants; and, that each of said ambiguously-defined Defendants, whether an agent, corporation, association, or otherwise, is in some way liable or responsible to Plaintiffs on the facts hereinafter alleged.

11. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the Defendants, sued herein as DOES 1 through 200, participated in some manner as an owner, engineer, architect, developer, contractor, subcontractor, material man, electrician, plumber, grader, roofer, landscaper, supplier of goods, seller, marketer, developer, and/or laborer, involved in the construction and development of the Plaintiffs' home. At such time as DOE Defendants' true names become known to Plaintiffs, Plaintiffs will seek leave of this court to amend this Complaint to insert said true names and capacities.

12. Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, each of the Defendants, herein DOES 201 through 300, were employees, agents, successors in interest, real estate brokers, real estate agents, mortgage brokers, officers, directors, escrow companies, escrow agents, marketing companies, and/or appraisers, involved in the promotion, marketing, sales, and financing of the single family homes purchased by Plaintiffs herein.

13. Each of the Defendants acted in concert, aided and abetted, and participated in the wrongful conduct, as alleged herein, with the other Defendants.

14. Each of the Defendants' actions points to a unity of interests and ownership that existed between the Defendants to such an extent that a real separation of entities did not exist, and their failure to treat each entity separately perpetrated a fraud on the public as more fully

alleged below.

<u>**GENERAL FACTUAL ALLEGATIONS**</u>

15.     Defendants are in the business of, among other things, developing, constructing, marketing, selling, and financing the purchase of new houses.

16.     Traditionally, builders such as Defendants would obtain raw land, upon which they build roads, sidewalks, common areas, and houses. Thereafter, outside companies, separate and distinct from both the Defendant and one another, would market and sell the houses, provide lending to new buyers, obtain the appraisals of each property, obtain the insurance for each property, and obtain title services for each property.

17.     Defendants conspired to increase sales volume and sales price of the houses they developed by offering the aforementioned auxiliary services, such as lending, sales, appraisals, insurance, title, etc., through their own companies. This began to take place for Defendants sometime prior to 2007, when they expanded their home construction business to not only build the houses, but to market them to prospective buyers and provide the buyers with the services necessary for purchase, including real estate agent services, financing, appraising, and title services.

18.     The organizational structure of Lennar was seamless at all times relevant to this Complaint. To increase the demand for their housing in the community, and to increase the sales volume and price of the individual homes, Lennar formed Defendant subsidiaries/affiliates to develop, construct, market, advertise, finance, and sell the houses. Lennar also set up Defendant subsidiaries or otherwise captive companies, including mortgage companies, title companies, and appraisal companies to facilitate sales by acting as a temporary financing company for new buyers, sales agents, appraisers and title companies, thereby keeping all major aspects of the sale within its control and thereby created for potential buyers "easy access" to money that was not otherwise available to them in the open marketplace to be used to finance their purchase, which, in turn, allowed the Defendants to increase the price of the home to be purchased, increase or decrease the amount of incentives it provided to induce Plaintiffs to purchase the homes, at their whim, outside of natural market forces, and allowed it to finance the Plaintiffs' purchase of the

homes without any risk to Lennar resulting from the financing, inflated home prices or large incentives.

19.     While Lennar set up a number of "subsidiary" and/or "affiliate" businesses, including Lennar Renaissance, Lennar Sales, and other LLCs and corporations to develop, construct, market, advertise  and sell houses, and UAM to finance new house sales; these business are separate entities in name only. Lennar and its directors, executives, and management control and direct the subsidiary businesses so that these businesses have few of the characteristics of a separate company, and instead have virtually all the characteristics of a division that simply facilitates the implementation of the home sales business of Lennar.

20.     Lennar, through its directors, executives, and management, at all times relevant to this complaint, set and directed policy for the subsidiary businesses, which developed, constructed, financed, marketed, sold and played an active role in each of these subsidiaries. With respect to Lennar Renaissance, Inc., and the other Lennar Defendants, each of such businesses is directed and controlled by Lennar Corporation as follows:

(a)     Lennar Corporation pays and directs employees and consultants who find the new development sites where the subsidiary company will work and do business;

(b)     Lennar Corporation creates the budgets, sales quotas, and business plans for the new development sites where the subsidiary company will work and do business;

(c)     Lennar Corporation provides the funding and employees to set up the subsidiary to work on the new development site;

(d)     Lennar Corporation selects, directs, and controls the executive(s) that manage the subsidiary that works on the development site;

(e)     Lennar Corporation establishes the compensation of the management of the subsidiaries;

(f)     Lennar Corporation creates, monitors, and enforces sales quota and business strategies for the subsidiaries' work on a development site;

(g)     Lennar Corporation secures outside funding for the subsidiaries, with both parent corporation and subsidiaries having access to the financing, and jointly

responsible for the financing;

(h)     Lennar Corporation shares both physical and human resources between itself and subsidiaries, as well as between different subsidiaries;

(i)     Lennar Corporation directs and controls the marketing of its subsidiaries, including colors, logos, slogans, names, and website marketing;

(j)     Lennar Corporation fully controls profit from the subsidiaries and reports to shareholders, government entities, and the public the profit and loss earned by subsidiaries as Lennar Corporations' profit and loss;

(k)     Each subsidiary's revenue is almost exclusively from work performed for Lennar Corporation;

(l)     The subsidiary building company performs the work of Lennar Corporation that is necessary to sell homes;

(m)     The subsidiary building company does not have a board of directors or management that is independent of Lennar Corporation; and

(n)     Lennar Corporation is solely in the business of building and selling homes, and if its subsidiaries did not build, market, sell homes, and provide mortgages to encourage further sales of homes, then a representative of Lennar Corporation would have to perform these duties.

21.     Based on information and belief, Lennar, through its directors, executives and management, also sets and directs policy for subsidiary businesses that provide temporary financing of the homes constructed and sold by Lennar Corporation, and its subsidiary, UAM, is directed and controlled by Lennar Corporation, as follows:

(a)     Lennar Corporation sets policy for UAM;

(b)     Lennar Corporation obtains funding for UAM;

(c)     Lennar Corporation selects, directs, and controls the executive(s) who manage UAM;

(d)     Lennar Corporation establishes the compensation of the management of UAM;

(e)     Lennar Corporation shares both physical and human resources between itself and

subsidiaries as well as between different subsidiaries;

(f)     Lennar Corporation directs and controls the marketing of UAM, including branding colors, logos, slogans, names and website marketing;

(g)     UAM coordinates its web site with Lennar Corporation;

(h)     Lennar Corporation controls profit from UAM and reports to shareholders, government entities, and the public the profit and loss earned by UAM as Lennar Corporation's profit and loss;

(i)     UAM' s revenue is almost exclusively from work performed for Lennar Corporation;

(j)     UAM performs the work of Lennar Corporation that facilitates selling homes by providing financing services; and

(k)     UAM does not have a board of directors or management that is independent of Lennar Corporation.

22.    Because of the business structure of Lennar Corporation and its subsidiaries, Lennar Corporation is legally responsible for not only its actions, but those of its subsidiaries. In addition, the subsidiaries are responsible not only for their acts, but of those of the other subsidiaries. To the extent the action of Lennar Corporation, or a subsidiary, is found to be illegal as alleged in the complaint, Lennar Corporation, and each subsidiary, is jointly and severally liable for the conduct.  Additionally, all the subsidiary businesses and companies involved in this process were acting in such a unity of interest that they are all alter egos of Lennar Corporation.

23.    Plaintiffs each purchased their homes as a <u>direct</u> result and in reliance, to their detriment, upon representations and information provided by Defendants as part of the market manipulation and financial scheme which resulted in each Plaintiff paying too much for their homes at the time of purchase compared to the market at the time of purchase resulting in a greater deficit in price to value now than buyers of other similar homes at the same time.  This market manipulation from the financial scheme was compounded by Defendants misrepresentations about their commitment to build and complete the Subdivision and its

infrastructure.  This Subdivision was developed from raw farmland by Defendants away from the then existing suburbs and urban areas.  The Defendants induced Plaintiffs to purchase in this isolated community based on specific representations of completion and infrastructure.  However, Defendants had no commitment to complete the development and Subdivision and in fact, after enticing Plaintiffs to purchase, slipped away in the middle of the night initially unnoticed to Plaintiffs, never to return, leaving the Plaintiffs stranded in the area, without the completion of the Subdivision or its infrastructure, and unable to move because of the upside down values of the homes.  The specific implementation of that fraudulent scheme and the representation on which each Plaintiff relied is specifically alleged as follows.

24.  ***Donald and Fammie Irving***, 2032 Earhart Way, Plumas Lake, CA 95961.  Investigated buying the Lennar built homes in the Subdivision in approximately February, 2007, through April, 2007.  In this February through April time frame up until making the initial offer on their home on April 29, 2007, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers, including the Irvings, with questions relative to the purchase, special incentives and financing, and early move ins.  The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products seven days a week.

In February through April, 2007, the Irvings directed their inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the Defendants' products, including the homes, the UAM financing, the "incentives", and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then-attendant New Home Consultants, including one with the initials "ZS", included written information as follows:

*   Documents identifying specific home plans that state "any building incentives offered are subject to financing through Universal American Mortgage Company."  This advertisement and other documents provided by ZS regarding "incentives" for using UAM were part of Defendants'

scheme to compel the Irvings to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit A.

* Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" loan ("everything's included") offered solely through UAM and only to buyers of Defendants' homes. The value of this incentive to those who purchase Defendants' homes was $8,000 plus other seller incentives alleged below. The incentive included a waiver of the non-recurring closing costs. This brochure provided by ZS regarding "incentives" for using UAM were part of the scheme to compel the Irvings to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit B.

* Collateral marketing pieces provided to the Irvings which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to the Irving's belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown. These mock ups contributed to Irvings' belief that Defendants would complete the Subdivision and

infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM which were so significant that the incentives in the amount of $42,000 to the Irvings just for purchase price incentive, not to mention other additional payments, compelled the Irvings to use UAM to enable them to afford and purchase the home (these large incentives were not offered to the Irvings when inquiring as to other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally controlled neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to the Irving's belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign an occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally

contributed to the Irving's belief that Defendants would complete the
Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made false and misleading oral representations to the
Irvings, in the model homes during this time, confirming the above-written promises and made
additional promises that included:

* The failure to use UAM results in a loss of the over $50,000 incentive
toward the purchase price and would prevent them from being able to
purchase the Defendants' homes;

* That to have the opportunity to qualify and purchase a home in the
Subdivision, they had no choice but to use UAM and purchase from
anyone other than Defendants in any other community in the Sacramento
area would result in a loss of significant money and lost opportunity to
buy in this unique community.

* The neighborhood would have a park to serve the community and buffer
the Subdivision from freeway ingress and egress (which subsequently
became an asphalted park and ride), proximate grocery store, professional
offices, and gas station;

* That all Subdivision improvements would be completed, and in a short
period of time;

* That because of the home and improvements in the to-be-completed
subdivision, the significant financial incentives offered by UAM and the
seller; restrictions imposed by the CC&R's, the price for the homes was
appropriate for the value received, a fact that was false because the
conditions and completion never occurred and Defendants ultimately
abandoned the project;

* That the price being offered, yet only affordable if purchased with a
mortgage from UAM, represented the true value of the home even after
the discounts and incentives Defendants provided to Plaintiffs.

The Irvings purchased their home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on April 29, 2007, in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme, which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

25.    ***Chandresh and Tina Bhakta***, 1868 Broken Bit Drive, Plumas Lake, CA 95961. Bhakta investigated buying the Lennar-built homes in the Subdivision in approximately January, 2007. In this January time frame up until making the initial offer on their home on January 15, 2007, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers including the Bhaktas, with questions relative to the purchase, special incentives and financing, and early move ins. The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products seven days a week.

In January, the Bhaktas directed their inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then-attendant New Home Consultants, including Randee Cruz, included written information as follows:

        *        Documents identifying specific home plans that state "any building incentives offered are subject to financing through Universal American Mortgage Company." This advertisement and other documents provided by Randee Cruz regarding "incentives" for using UAM were part of Defendants' scheme to compel the Bhaktas to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit A.

        *        Marketing brochures that advertise Defendant UAM as a mortgage

provider of an "ei" loan ("everything's included") offered solely through UAM and only to buyers of Defendants' homes. The value of this incentive to those who purchase Defendants' homes was $10,000 plus other seller incentives alleged below. The incentive included a waiver of the non-recurring closing costs. This brochure provided by Randee Cruz regarding "incentives" for using UAM were part of the scheme to compel the Bhaktas to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit B.

\* Collateral marketing pieces provided to the Bhaktas which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to the Bhaktas' belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

\* Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown. These mock ups contributed to Bhaktas' belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

\* A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed

improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $127,000 to the Bhaktas just for purchase price incentives not to mention other additional payments, compelled the Bhaktas to use UAM to enable them to afford and purchase the home (these large incentives were not offered to the Bhaktas when inquiring as to other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development". This document additionally contributed to the Bhaktas' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign an occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to the Bhaktas' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to the Bhaktas in the model homes during this time confirming the above-written promises and made additional promises

that included:

      \*      The failure to use UAM results in a loss of the over $137,000 incentive toward the purchase price and would prevent them from being able to purchase the Defendants' homes;

      \*      That to have the opportunity to qualify and purchase a home in the Subdivision, they had no choice but to use UAM and purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

      \*      The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

      \*      That all Subdivision improvements would be completed, and in a short period of time;

      \*      That because of the home and improvements in the to-be-completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing their home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

      \*      That the price being offered, yet only affordable if purchased with a mortgage from UAM, represented the true value of the home even after the discounts and incentives Defendants provided to Plaintiffs.

The Bhaktas purchased their home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on January 15, 2007, in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as

1 | alleged further below.

2 | 26.    *John Carreras*, 2071 Danforth Way, Plumas Lake, CA 95961.

3 | Carreras investigated buying the Lennar built homes in the Subdivision in approximately

4 | February through March, 2007.  In this February through March time frame up until making the

5 | initial offer on their home on March 10, 2007, Defendants employed "New Home Consultants"

6 | to market the Defendants' homes and products from sales offices at the Subdivision and to whom

7 | Defendants directed potential buyers including the Carreras' with questions relative to the

8 | purchase, special incentives and financing, and early move ins.  The New Home Consultants

9 | were stationed at the model home sales offices at the Subdivision to market and sell Defendants'

10 | products seven days a week.

11 |      In February through April, Carreras directed his inquiries to the New Home Consultants

12 | as instructed by Lennar in marketing brochures and were provided information about the

13 | Defendants' products including the homes, the UAM financing, the incentives, and monetary

14 | penalties and prohibition for not using Defendants' financing, by those consultants.

15 |      This information provided by the then-attendant New Home Consultants including one

16 | with the initials "WS"  included written information as follows:

17 |                *    Documents identifying specific home plans that state "any building

18 |                     incentive offered are subject to financing through Universal American

19 |                     Mortgage Company." This advertisement and other documents provided

20 |                     by WS regarding "incentives" for using UAM were part of Defendants'

21 |                     scheme to compel the Carreras to purchase the home at an inflated price

22 |                     because the "incentives" provided the only means for the Plaintiffs to

23 |                     purchase the homes at, at the time unknown to Plaintiff,  an artificially

24 |                     inflated price.  Exhibit A.

25 |                *    Marketing brochures that advertise Defendant UAM as a mortgage

26 |                     provider of an "ei" loan ("everything's included") offered solely through

27 |                     UAM and only to buyers of Defendants' homes.  The value of this

28 |                     incentive to those who purchase Defendants' homes was $8,000 plus other

Fifth Amended Complaint for Damages          -18-                    Irving, et al., v Lennar

seller incentives alleged below.  The incentive included a waiver of the non-recurring closing costs.  This brochure provided by WS regarding "incentives" for using UAM were part of the scheme to compel the Carreras to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff,  an artificially inflated price.  Exhibit B.

*       Collateral marketing pieces provided to the Carreras which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to the Carreras' belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

*       Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown.  These mock ups contributed to Carreras' belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

*       A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed";

significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $17,300 to the Carreras just for purchase price incentive not to mention other additional payments, compelled the Carreras to use UAM to enable them to afford and purchase the home (these large incentives were not offered to the Carreras when inquiring as to other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to the Carreras' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign an occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to the Carreras' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to the Carreras in the model homes during this time confirming the above written promises and made additional promises that included:

* The failure to use UAM results in a loss of the over $18,000 incentive toward the purchase price and would prevent them from being able to

purchase the Defendants' homes;

* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community;

* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

* That all Subdivision improvements would be completed, and in a short period of time;

* That because of the home and improvements in the to-be-completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing their home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

* That the price being offered, yet only affordable if purchased with a mortgage from UAM, represented the true value of the home even after the discounts and incentives Defendants provided to Plaintiffs.

The Carreras' purchased their home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on March 10, 2007, in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

27. **_Isidro Escareno_**, 2014 Lothland Court, Plumas Lake, CA 95961. Isidro Escareno investigated buying a Lennar-built home in the Subdivision in approximately February, 2007,

through May, 2007. During this February through May time frame, and up until Escarenos made the initial offer on their home on May 17, 2007, Defendants employed "New Home Consultants" to market the Defendants' homes and tied products from sales offices at the Subdivision, and to whom Defendants directed potential buyers, including the Escarenos, with questions relative to the purchase, special incentives, and financing, and early move-ins. The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products seven days a week.

In February through May, 2007, Escarenos directed inquiries to the New Home Consultants as instructed by Lennar, in marketing brochures, and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibitions for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants, including one with the apparent name with initials "MS" and/or "EZ", included written information as follows:

* Documents identifying specific home plans that state "any building incentives offered are subject to financing through Universal American Mortgage Company". This advertisement and other documents provided by MS and/or EZ regarding "incentives" for using UAM were part of Defendants' scheme to compel the Escarenos to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit A.

* Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" loan ("everything's included") offered solely through UAM and only to buyers of Defendants' homes. The value of this incentive to those who purchase Defendants homes was $8,000 plus other seller incentives alleged below. The incentive included a waiver of the non-recurring closing costs. This brochure provided by MS and/or EZ regarding "incentives" for using UAM were part of the scheme to compel

the Escarenos to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit B.

*       Collateral marketing pieces provided to the Escarenos which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to the Escarenos' belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

*       Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown. These mock ups contributed to Escarenos' belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

*       A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM, which were significant and included incentives in the amount of $46,950 just for purchase price incentive, compelled Escarenos to use UAM to enable

them to afford and purchase the home (these large incentives were not offered to the Escarenos when inquiring as to other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified, and restricted development to, a community free of nuisance and irregularity, with homes to be occupied by single families and constructed in a typical architecturally controlled safe and stable suburban neighborhood and which further specially confirmed that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to the Escarenos' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign an occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to the Escarenos' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to Escarenos in the model homes during this time confirming the above written promises, and made additional promises that included:

* The failure to use UAM results in a loss of the over $54,000 in incentives toward the purchase price and would prevent them from being able to purchase the Defendants' homes;

* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but to use UAM, and to purchase from

anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

\* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices, and a gas station;

\* That all Subdivision improvements would be completed, and in a short period of time;

\* That because of the homes and improvements to-be-completed in the subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing their home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

\* That the advertised base price of the home represented the true market value of the home, and by taking advantage of the incentive discounts, Escarenos were getting a great financial deal.

Escarenos purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on May 17, 2007, in reliance of the above specific representations, and as a victim to the Defendants' fraudulent scheme, which included the above representations that were false, and as part of the fraudulent scheme to deceive home buyers as alleged further below.

28. *Dan Lewerenz*, 939 Cavanaugh Court, Plumas Lake, CA 9596. Lewerenz investigated buying the Lennar built homes in the Subdivision in approximately May through August 2007. In this May time frame up until making the initial offer on their home on August 27, 2007, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers

including the Lewerenzes with questions relative to the purchase, special incentives and financing, and early move ins. The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In May through August 2007, Lewerenz directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including one with the initials "MS" and one with the initials "EZ" included written information as follows:

                     \*                Documents identifying specific home plans that state "any building incentives offered are subject to financing through Universal American Mortgage Company". This advertisement and other documents provided by MS and/or EZ regarding "incentives" for using UAM were part of Defendants' scheme to compel the Lewerenzes to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit A.

                     \*                Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" loan ("everything's included") offered solely through UAM and only to buyers of Defendants' homes. The value of this incentive to those who purchase Defendants' homes was $8,000 plus other seller incentives alleged below. The incentive included a waiver of the non-recurring closing costs. This brochure provided by MS and/or EZ regarding "incentives" for using UAM were part of the scheme to compel the Lewerenzes to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit B.

1       *   Collateral marketing pieces provided to the Lewerenzes which showed the

2          Subdivision with completed homes, sidewalks, named streets, curb and

3          gutter, common areas, parks, and surrounding infrastructure, including

4          promised road ingress and egress, improvements which contributed to the

5          Lewerenzes' belief that Defendants would complete the Subdivision and

6          infrastructure, fact which Defendants had no basis to believe were true at

7          the time and at the time of filing this action had not been completed.

8       *   Mock ups, maintained by Defendants in the model homes sales office,

9          showing the lots and homes to be constructed and sold in the community

10         which specifically show the Subdivisions completed, with the homes built

11         out, the sidewalks and roads providing ingress and egress to the

12         communities completed, the parks and common areas completed, the

13         surrounding general infrastructure shown.  These mock ups contributed to

14         Lewerenzes' belief that Defendants would complete the Subdivision and

15         infrastructure, facts which Defendants had no basis to believe were true at

16         the time and at the time of filing this action had not been completed.

17      *   A form of a "Purchase Agreement and Deposit Receipt and Escrow

18         Instructions" for the promised home and surrounding completed

19         improvements. That proposed agreement stated specifically that "funds

20         will not be released from escrow upon purchase until and unless all the

21         common areas and improvements within that phase will be completed";

22         significant financial incentives to use Defendant UAM, which were so

23         significant that the incentives in the amount of $83,450 just for purchase

24         price incentive not to mention other additional payment, compelled the

25         Lewerenzes to use UAM to enable them to afford and purchase the home

26         (these large incentives were not offered to the Lewerenzes when inquiring

27         as to other homes from other builders).

28      *   Recorded Covenants, Conditions and Restrictions which identified and

restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to the Lewerenzes' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign an occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to the Lewerenzes' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to Lewerenzes in the model homes during this time confirming the above written promises and made additional promises that included:

* The failure to use UAM results in a loss of the over $90,000 incentive toward the purchase price;

* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently

became an asphalted park and ride), proximate grocery store, professional offices and gas station;

\* That all Subdivision improvements would be completed, and in a short period of time;

\* That because of the home and improvements in the to-be-completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing their home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

\* That the price being offered, yet only affordable if purchased with a mortgage from UAM, represented the true value of the home even after the discounts and incentives Defendants provided to Lewerenzes.

Lewerenzes purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on August 27, 2007 in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

29. **Rui and Rose Lopes,** 1892 Broken Bit Drive, Plumas Lake, CA 9596. Lopeses investigated buying the Lennar built homes in the Subdivision in approximately January 2006 through April 2006. In this January time frame up until making the initial offer on their home on April 29, 2006, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers including the Lopeses with questions relative to the purchase, special incentives and financing, and early move ins. The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In January through April 2006, Lopes directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the

Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including Kelly Lake and Randee Creet included written information as follows:

      \*      Documents identifying specific home plans that state "any building incentives offered are subject to financing through Universal American Mortgage Company". This advertisement and other documents provided by Kelly Lake and Randee Creet regarding "incentives" for using UAM were part of Defendants' scheme to compel the Lopeses to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit A.

      \*      Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" - loan (everything's included. . ) offered solely through UAM and only to buyers of Defendants' homes. The value of this incentive to those who purchase Defendants' homes was $5,000 plus other seller incentives alleged below. The incentive included a waiver of the non-recurring closing costs. This brochure provided by Kelly Lake and Randee Creet regarding "incentives" for using UAM were part of the scheme to compel the Lopeses to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit B.

      \*      Collateral marketing pieces provided to the Lopeses which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to the Lopeses' belief that Defendants would complete the Subdivision and

infrastructure, fact which Defendants had no basis to believe were true at
the time and at the time of filing this action had not been completed.

* Mock ups, maintained by Defendants in the model homes sales office,
showing the lots and homes to be constructed and sold in the community
which specifically show the Subdivisions completed, with the homes built
out, the sidewalks and roads providing ingress and egress to the
communities completed, the parks and common areas completed, the
surrounding general infrastructure shown. These mock ups contributed to
Lopeses' belief that Defendants would complete the Subdivision and
infrastructure, facts which Defendants had no basis to believe were true at
the time and at the time of filing this action had not been completed.

* A form of a "Purchase Agreement and Deposit Receipt and Escrow
Instructions" for the promised home and surrounding completed
improvements. That proposed agreement stated specifically that "funds
will not be released from escrow upon purchase until and unless all the
common areas and improvements within that phase will be completed";
significant financial incentives to use Defendant UAM, which were so
significant that the incentives in the amount of $13,155 just for purchase
price incentive not to mention other additional payment, compelled the
Lopeses to use UAM to enable them to afford and purchase the home
(these large incentives were not offered to the Lopes when inquiring as to
other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and
restricted development to a community free of nuisance and irregularity
with homes to be occupied by single families and constructed in a typical
architecturally-controlled safe and stable suburban neighborhood and
which further specially confirm that constructing residential dwellings and
incidental improvements is "essential to the establishment and welfare of

the Development." This document additionally contributed to the Lopeses'
belief that Defendants would complete the Subdivision and the
infrastructure, not abandon it.

    \*    The Department of Real Estate Public Report issued to every potential
purchaser as part of the California mandated disclosure which states that
Defendant intends to sell all of the lots in the community, that buyers who
sign an occupancy agreement will be required to live in the homes for at
least a year, and that the streets which had not at the time been completed
would be completed by the Defendants. This document additionally
contributed to the Lopeses' belief that Defendants would complete the
Subdivision and the infrastructure, not abandon it.

    The New Home Consultants also made oral representations to Lopes in the model homes
during this time confirming the above written promises and made additional promises that
included:

    \*    The failure to use UAM results in a loss of the over $18,000 incentive
toward the purchase price;

    \*    That to have the opportunity to qualify and purchase a home in the
Subdivision they had no choice but use UAM and to purchase from
anyone other than Defendants in any other community in the Sacramento
area would result in a loss of significant money and lost opportunity to
buy in this unique community.

    \*    The neighborhood would have a park to serve the community and buffer
the Subdivision from freeway ingress and egress (which subsequently
became an asphalted park and ride), proximate grocery store, professional
offices and gas station;

    \*    That all Subdivision improvements would be completed, and in a short
period of time;

    \*    That because of the home and improvements in the to-be-completed

subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing their home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

\*      That the price being offered yet only affordable if purchased with a mortgage from UAM, represented the true value of the home even after the discounts and incentives Defendants provided to Lopes.

Lopes  purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on April 29, 2006 in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

30.     **Alfredo and Eugenia Lorica,** 1875 Broken Bit Drive, Plumas Lake, CA 95961. Loricas investigated buying the Lennar built homes in the Subdivision in approximately June 2006 through September l 2006.  In this June time frame up until making the initial offer on their home on September 3, 2006, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers including the Loricas with questions relative to the purchase, special incentives and financing, and early move ins.  The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In June through September 2006, Lorica directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including Kelly Lake and Randee Creet included written information as follows:

*       Documents identifying specific home plans that state "any building
incentive offered are subject to financing through Universal American
Mortgage Company".  This advertisement and other documents provided
by Kelly Lake and Randee Creet regarding "incentives" for using UAM
were part of Defendants' scheme to compel the Loricas to purchase the
home at an inflated price because the "incentives" provided the only
means for the Plaintiffs to purchase the homes at, at the time unknown to
Plaintiff,  an artificially inflated price.  Exhibit A.

*       Marketing brochures that advertise Defendant UAM as a mortgage
provider of an "ei" loan ("everything's included") offered solely through
UAM and only to buyers of Defendants homes.  The value of this
incentive to those who purchase Defendants homes was $9,000 plus other
seller incentives alleged below.  The incentive included a waiver of the
non-recurring closing costs.  This brochure provided by ZS regarding
"incentives" for using UAM were part of the scheme to compel the
Loricas to purchase the home at an inflated price because the "incentives"
provided the only means for the Plaintiffs to purchase the homes at, at the
time unknown to Plaintiff,  an artificially inflated price.  Exhibit B.

*       Collateral marketing pieces provided to the Loricas which showed the
Subdivision with completed homes, sidewalks, named streets, curb and
gutter, common areas, parks, and surrounding infrastructure, including
promised road ingress and egress, improvements which contributed to the
Loricas' belief that Defendants would complete the Subdivision and
infrastructure, fact which Defendants had no basis to believe were true at
the time and at the time of filing this action had not been completed.

*       Mock ups, maintained by Defendants in the model homes sales office,
showing the lots and homes to be constructed and sold in the community
which specifically show the Subdivisions completed, with the homes built

out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown.  These mock ups contributed to Loricas' belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

\* A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $30,000 just for purchase price incentive not to mention other additional payment, compelled the Loricas to use UAM to enable them to afford and purchase the home (these large incentives were not offered to the Loricas when inquiring as to other homes from other builders).

\* Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to the Loricas' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

\* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that

Defendant intends to sell all of the lots in the community, that buyers who sign an occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to the Loricas' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to Lorica in the model homes during this time confirming the above written promises and made additional promises that included:

* The failure to use UAM results in a loss of the over $39,000 incentive toward the purchase price;

* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

* That all Subdivision improvements would be completed, and in a short period of time;

* That because of the home and improvements in the to-be-completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing their home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

*　　　　That the price being offered, yet only affordable if purchased with a

　　　　　　　　　　　　　　mortgage from UAM, represented the true value of the home even after

　　　　　　　　　　　　　　the discounts and incentives Defendants provided to Lorica.

Loricas  purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on September 3, 2006 in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

　　　　31.　　***Dan Maschiovecchio***, 1908 Broken Bit Drive, Plumas Lake, CA 95961. Maschiovecchio investigated buying the Lennar built homes in the Subdivision in approximately March through June 2006.  In this March through June time frame up until making the initial offer on their home on June 26, 2006, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers including Maschiovecchio with questions relative to the purchase, special incentives and financing, and early move ins.  The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In June through September 2006, Maschiovecchio directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and was provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including Kelly Lake and Randee Creet included written information as follows:

　　　　　　　　　　*　　　　Documents identifying specific home plans that state "any building

　　　　　　　　　　　　　　incentive offered are subject to financing through Universal American

　　　　　　　　　　　　　　Mortgage Company".  This advertisement and other documents provided

　　　　　　　　　　　　　　by Kelly Lake and Randee Creet regarding "incentives" for using UAM

　　　　　　　　　　　　　　were part of Defendants' scheme to compel the Machiovecchio home at an

inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price.  Exhibit A.

* Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" - loan (everything's included. . ) offered solely through UAM and only to buyers of Defendants homes.  The value of this incentive to those who purchase Defendants homes was $8,000 plus other seller incentives alleged below.  The incentive included a waiver of the non-recurring closing costs.  This brochure provided by Kelly Lake and Randee Creet regarding "incentives" for using UAM were part of the scheme to compel Maschiovecchio to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price.  Exhibit B.

* Collateral marketing pieces provided to Maschiovecchio which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to Maschiovecchio's belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown.  These mock ups contributed to Maschiovecchio's belief that Defendants would complete the Subdivision

and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

    \*    A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $25,000 just for purchase price incentive not to mention other additional payment compelled Maschiovecchio to use UAM to enable them to afford and purchase the home (these large incentives were not offered to Maschiovecchio when inquiring as to other homes from other builders).

    \*    Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to Maschiovecchio's belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

    \*    The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign an occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed,

would be completed by the Defendants. This document additionally contributed to Maschiovecchio's belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to Maschiovecchio in the model homes during this time confirming the above written promises and made additional promises that included:

* The failure to use UAM results in a loss of the over $33,000 incentive toward the purchase price;

* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

* That all Subdivision improvements would be completed, and in a short period of time;

* That because of the home and improvements in the to-be-completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing his home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

* That the price being offered, yet only affordable if purchased with a mortgage from UAM, represented the true value of the home even after the discounts and incentives Defendants provided to Maschiovecchio.

Maschiovecchio purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on June 26, 2006 in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

32.     *Donald O'Keefe*, 1406 High Noon Drive, Plumas Lake, CA 95961. O'Keefe investigated buying the Lennar built homes in the Subdivision in approximately January through March 2007. In this January through March time frame up until making the initial offer on their home on March 12, 2007, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers including O'Keefe with questions relative to the purchase, special incentives and financing, and early move ins. The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In January through March 2007, O'Keefe directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and was provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including Kelly Lake and Randee Cruz included written information as follows:

                    *       Documents identifying specific home plans that state "any building
                            incentive offered are subject to financing through Universal American
                            Mortgage Company". This advertisement and other documents provided
                            by Kelly Lake and Randee Cruz regarding "incentives" for using UAM
                            were part of Defendants' scheme to compel O'Keefe to purchase the home
                            at an inflated price because the "incentives" provided the only means for
                            the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff,
                            an artificially inflated price. Exhibit A.

| | |
|---|---|
| 1 | * Marketing brochures that advertise Defendant UAM as a mortgage |
| 2 | provider of an "ei" - loan (everything's included. . ) offered solely through |
| 3 | UAM and only to buyers of Defendants' homes. The value of this |
| 4 | incentive to those who purchase Defendants' homes was $8,000 plus other |
| 5 | seller incentives alleged below. The incentive included a waiver of the |
| 6 | non-recurring closing costs. This brochure provided by Kelly Lake and |
| 7 | Randee Cruz regarding "incentives" for using UAM were part of the |
| 8 | scheme to compel O'Keefe to purchase the home at an inflated price |
| 9 | because the "incentives" provided the only means for the Plaintiffs to |
| 10 | purchase the homes at, at the time unknown to Plaintiff, an artificially |
| 11 | inflated price. Exhibit B. |
| 12 | * Collateral marketing pieces provided to O'Keefe which showed the |
| 13 | Subdivision with completed homes, sidewalks, named streets, curb and |
| 14 | gutter, common areas, parks, and surrounding infrastructure, including |
| 15 | promised road ingress and egress, improvements which contributed to |
| 16 | O'Keefe's belief that Defendants would complete the Subdivision and |
| 17 | infrastructure, fact which Defendants had no basis to believe were true at |
| 18 | the time and at the time of filing this action had not been completed. |
| 19 | * Mock ups, maintained by Defendants in the model homes sales office, |
| 20 | showing the lots and homes to be constructed and sold in the community |
| 21 | which specifically show the Subdivisions completed, with the homes built |
| 22 | out, the sidewalks and roads providing ingress and egress to the |
| 23 | communities completed, the parks and common areas completed, the |
| 24 | surrounding general infrastructure shown. These mock ups contributed to |
| 25 | O'Keefe's belief that Defendants would complete the Subdivision and |
| 26 | infrastructure, facts which Defendants had no basis to believe were true at |
| 27 | the time and at the time of filing this action had not been completed. |
| 28 | * A form of a "Purchase Agreement and Deposit Receipt and Escrow |

Instructions" for the promised home and surrounding completed
improvements. That proposed agreement stated specifically that "funds
will not be released from escrow upon purchase until and unless all the
common areas and improvements within that phase will be completed";
significant financial incentives to use Defendant UAM which were so
significant that the incentives in the amount of $18,604 just for purchase
price incentive not to mention other additional payment compelled
O'Keefe to use UAM to enable them to afford and purchase the home
(these large incentives were not offered to O'Keefe when inquiring as to
other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and
restricted development to a community free of nuisance and irregularity
with homes to be occupied by single families and constructed in a typical
architecturally-controlled safe and stable suburban neighborhood and
which further specially confirm that constructing residential dwellings and
incidental improvements is "essential to the establishment and welfare of
the Development." This document additionally contributed to O'Keefe's
belief that Defendants would complete the Subdivision and the
infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential
purchaser as part of the California mandated disclosure which states that
Defendant intends to sell all of the lots in the community, that buyers who
sign an occupancy agreement will be required to live in the homes for at
least a year, and that the streets, which had not at the time been completed,
would be completed by the Defendants. This document additionally
contributed to O'Keefe's belief that Defendants would complete the
Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to O'Keefe in the model

homes during this time confirming the above written promises and made additional promises that included:

       \*      The failure to use UAM results in a loss of the over $26,000 incentive toward the purchase price;

       \*      That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

       \*      The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

       \*      That all Subdivision improvements would be completed, and in a short period of time;

       \*      That because of the home and improvements in the to-be-completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing his home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

       \*      That the price being offered, yet only affordable if purchased with a mortgage from UAM, represented the true value of the home even after the discounts and incentives Defendants provided to O'Keefe.

O'Keefe purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on March 27, 2007 in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as

alleged further below.

33. ***Greg and Olga Peterson,*** 1375 Sundance Drive, Plumas Lake, CA 95961.
Petersons investigated buying the Lennar built homes in the Subdivision in approximately
September through October 2007. In this January through March time frame up until making the
initial offer on their home on October 29, 2007, Defendants employed "New Home Consultants"
to market the Defendants' homes and products from sales offices at the Subdivision and to whom
Defendants directed potential buyers including the Petersons with questions relative to the
purchase, special incentives and financing, and early move ins. The New Home Consultants
were stationed at the model home sales offices at the Subdivision to market and sell Defendants'
products 7 days a week.

In September through October 2007, Petersons directed inquiries to the New Home
Consultants as instructed by Lennar in marketing brochures and were provided information
about the Defendants' products including the homes, the UAM financing, the incentives, and
monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including Kelly
Lake and Randee Cruz included written information as follows:

* Documents identifying specific home plans that state "any building
incentive offered are subject to financing through Universal American
Mortgage Company". This advertisement and other documents provided
by Kelly Lake and Randee Cruz regarding "incentives" for using UAM
were part of Defendants' scheme to compel the Petersons to purchase the
home at an inflated price because the "incentives" provided the only
means for the Plaintiffs to purchase the homes at, at the time unknown to
Plaintiff, an artificially inflated price. Exhibit A.
* Marketing brochures that advertise Defendant UAM as a mortgage
provider of an "ei" - loan (everything's included. . ) offered solely through
UAM and only to buyers of Defendants' homes. The value of this
incentive to those who purchase Defendants' homes was $8,000 plus other

seller incentives alleged below.  The incentive included a waiver of the non-recurring closing costs.  This brochure provided by Kelly Lake and Randee Cruz regarding "incentives" for using UAM were part of the scheme to compel the Petersons to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff,  an artificially inflated price.  Exhibit B.

*       Collateral marketing pieces provided to the Petersons which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to the Petersons' belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

*       Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown.  These mock ups contributed to Petersons' belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

*       A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed";

significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $45,000 just for purchase price incentive not to mention other additional payment, compelled the Petersons to use UAM to enable them to afford and purchase the home (these large incentives were not offered to the Petersons when inquiring as to other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to the Petersons' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign an occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to the Petersons' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to Petersons in the model homes during this time confirming the above written promises and made additional promises that included:

* The failure to use UAM results in a loss of the over $53,000 incentive toward the purchase price;

* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

* That all Subdivision improvements would be completed, and in a short period of time;

* That because of the home and improvements in the to be completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing their home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

* That the price being offered yet only affordable if purchased with a mortgage from UAM, represented the true value of the home even after the discounts and incentives Defendants provided to the Petersons.

Petersons purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on October 29, 2007 in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

34. *Themis Sakellariou*, 1880 Broken Bit Drive, Plumas Lake, CA 95961. Sakellariou investigated buying the Lennar built homes in the Subdivision in approximately July through October 2006. In this July through October time frame up until making the initial offer

on their home on October 14, 2006, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers including Sakellariou with questions relative to the purchase, special incentives and financing, and early move ins.  The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In July through October 2006, Sakellariou directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including Kelly Lake, Randee Cruz, Kara J. included written information as follows:

            \*         Documents identifying specific home plans that state "any building incentive offered are subject to financing through Universal American Mortgage Company".  This advertisement and other documents provided by Kelly Lake, Randee Cruz, and Kara J. regarding "incentives" for using UAM were part of Defendants' scheme to compel the Sakellarious to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff,  an artificially inflated price.  Exhibit A.

            \*         Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" - loan (everything's included. . ) offered solely through UAM and only to buyers of Defendants homes.  The value of this incentive to those who purchase Defendants' homes was $8,000 plus other seller incentives alleged below.  The incentive included a waiver of the non-recurring closing costs.  This brochure provided by Kelly Lake, Randee Cruz, and Kara J. regarding "incentives" for using UAM were part of the scheme to compel the Sakellarious to purchase the home at an

inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit B.

* Collateral marketing pieces provided to the Sakellarious which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to the Sakellarious' belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown. These mock ups contributed to Sakellarious' belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM which were so significant that the incentives in the amount of $132,970 just for purchase price incentive not to mention other additional payment compelled Sakellarious to use UAM to enable them to afford and purchase the home

1    (these large incentives were not offered to Sakellarious when inquiring as

2    to other homes from other builders).

3    *    Recorded Covenants, Conditions and Restrictions which identified and

4    restricted development to a community free of nuisance and irregularity

5    with homes to be occupied by single families and constructed in a typical

6    architecturally-controlled safe and stable suburban neighborhood and

7    which further specially confirm that constructing residential dwellings and

8    incidental improvements is "essential to the establishment and welfare of

9    the Development." This document additionally contributed to the

10   Sakellarious' belief that Defendants would complete the Subdivision and

11   the infrastructure, not abandon it.

12   *    The Department of Real Estate Public Report issued to every potential

13   purchaser as part of the California mandated disclosure which states that

14   Defendant intends to sell all of the lots in the community, that buyers who

15   sign an occupancy agreement will be required to live in the homes for at

16   least a year, and that the streets, which had not at the time been completed,

17   would be completed by the Defendants. This document additionally

18   contributed to the Sakellarious' belief that Defendants would complete the

19   Subdivision and the infrastructure, not abandon it.

20   The New Home Consultants also made oral representations to Sakellariou in the model

21   homes during this time confirming the above written promises and made additional promises that

22   included:

23   *    The failure to use UAM results in a loss of the over $140,000 incentive

24   toward the purchase price;

25   *    That to have the opportunity to qualify and purchase a home in the

26   Subdivision they had no choice but use UAM and to purchase from

27   anyone other than Defendants in any other community in the Sacramento

28   area would result in a loss of significant money and lost opportunity to

1    buy in this unique community.

2    *    The neighborhood would have a park to serve the community and buffer

3         the Subdivision from freeway ingress and egress (which subsequently

4         became an asphalted park and ride), proximate grocery store, professional

5         offices and gas station;

6    *    That all Subdivision improvements would be completed, and in a short

7         period of time;

8    *    That because of the home and improvements in the to-be-completed

9         subdivision, the significant financial incentives offered by UAM and the

10        seller; restrictions imposed by the CC&R's, purchasing his home would be

11        a sound financial investment, a fact that was false because the conditions

12        and completion never occurred and Defendants ultimately abandoned the

13        project;

14   *    That the price being offered yet only affordable if purchased with a

15        mortgage from UAM, represented the true value of the home even after

16        the discounts and incentives Defendants provided to Sakellariou.

17        Sakellariou  purchased the home by way of executing the "Purchase Agreement and

18   Deposit Receipt and Escrow Instructions" on October 14, 2006 in reliance of the above specific

19   representation and as a victim to the Defendants' fraudulent scheme which included the above

20   representations that were false and part of the fraudulent scheme to deceive home buyers as

21   alleged further below.

22        35.    *E. Scott Coelho and Valerie Salazar,* 922 Cavanaugh Court, Plumas Lake, CA

23   95961.  Coelho/Salazar investigated buying the Lennar built homes in the Subdivision in

24   approximately June through August 2007.  In this June through August time frame up until

25   making the initial offer on their home on August 18, 2007, Defendants employed "New Home

26   Consultants" to market the Defendants' homes and products from sales offices at the Subdivision

27   and to whom Defendants directed potential buyers including the Coelho/Salazar with questions

28   relative to the purchase, special incentives and financing, and early move ins.  The New Home

Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In June through August 2007, Coelho/Salazar directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including "CZ" or "MS" included written information as follows:

> \* Documents identifying specific home plans that state "any building incentive offered are subject to financing through Universal American Mortgage Company". This advertisement and other documents provided by CZ or MS regarding "incentives" for using UAM were part of Defendants' scheme to compel Coelho/Salazar to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit A.

> \* Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" loan ("everything's included") offered solely through UAM and only to buyers of Defendants homes. The value of this incentive to those who purchase Defendants homes was $8,000 plus other seller incentives alleged below. The incentive included a waiver of the non-recurring closing costs. This brochure provided by CZ or MS regarding "incentives" for using UAM were part of the scheme to compel Coelho/Salazar to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit B.

> \* Collateral marketing pieces provided to Coelho/Salazar which showed the

Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to Coelho/Salazar's belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown. These mock ups contributed to Coelho/Salazar's belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $32,450 just for purchase price incentive not to mention other additional payment, compelled the Coelho/Salazar to use UAM to enable them to afford and purchase the home (these large incentives were not offered to Coelho/Salazar when inquiring as to other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and

restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to Coelho/Salazar's belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

    \* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign on occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to Coelho/Salazar's belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to Coelho/Salazar in the model homes during this time confirming the above written promises and made additional promises that included:

    \* The failure to use UAM results in a loss of the over $40,000 incentive toward the purchase price;

    \* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

    \* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently

became an asphalted park and ride), proximate grocery store, professional
offices and gas station;

* That all Subdivision improvements would be completed, and in a short
period of time;

* That because of the home and improvements in the to-be-completed
subdivision, the significant financial incentives offered by UAM and the
seller; restrictions imposed by the CC&R's, purchasing their home would
be a sound financial investment, a fact that was false because the
conditions and completion never occurred and Defendants ultimately
abandoned the project;

* That the price being offered, yet only affordable if purchased with a
mortgage from UAM, represented the true value of the home even after
the discounts and incentives Defendants provided to Coelho/Salazar.

Coelho/Salazar purchased the home by way of executing the "Purchase Agreement and
Deposit Receipt and Escrow Instructions" on August 18, 2007, in reliance of the above specific
representation and as a victim to the Defendants' fraudulent scheme which included the above
representations that were false and part of the fraudulent scheme to deceive home buyers as
alleged further below.

36. ***Jimmy and Sharon Turner***, 904 Chalice Creek Drive, Plumas Lake, CA 95961

Turner investigated buying the Lennar built homes in the Subdivision in approximately
April through May 2007. In this April through May time frame up until making the initial offer
on their home on May 8, 2007, Defendants employed "New Home Consultants" to market the
Defendants' homes and products from sales offices at the Subdivision and to whom Defendants
directed potential buyers including the Turners with questions relative to the purchase, special
incentives and financing, and early move ins. The New Home Consultants were stationed at the
model home sales offices at the Subdivision to market and sell Defendants' products 7 days a
week.

In June through August 2007, Turner directed inquiries to the New Home Consultants as

instructed by Lennar in marketing brochures and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including Heather Hernandez included written information as follows:

* Documents identifying specific home plans that state "any building incentive offered are subject to financing through Universal American Mortgage Company". This advertisement and other documents provided by Heather Hernandez regarding "incentives" for using UAM were part of Defendants' scheme to compel the Turners to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit A.

* Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" - loan (everything's included. . ) offered solely through UAM and only to buyers of Defendants homes. The value of this incentive to those who purchase Defendants homes was $9,750 plus other seller incentives alleged below. The incentive included a waiver of the non-recurring closing costs. This brochure provided by Heather Hernandez regarding "incentives" for using UAM were part of the scheme to compel the Turners to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit B.

* Collateral marketing pieces provided to the Turners which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to the

Turners' belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown. These mock ups contributed to Turners' belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $32,450.00 just for purchase price incentive not to mention other additional payment, compelled the Turners to use UAM to enable them to afford and purchase the home (these large incentives were not offered to the Turners when inquiring as to other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and

incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to the Turners' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign an occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to the Turners' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to the Turners in the model homes during this time confirming the above written promises and made additional promises that included:

* The failure to use UAM results in a loss of the over $42,000 incentive toward the purchase price;

* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

* That all Subdivision improvements would be completed, and in a short period of time;

| | |
|---|---|
| 1 | * That because of the home and improvements in the to-be-completed |
| 2 | subdivision, the significant financial incentives offered by UAM and the |
| 3 | seller; restrictions imposed by the CC&R's, purchasing her home would |
| 4 | be a sound financial investment, a fact that was false because the |
| 5 | conditions and completion never occurred and Defendants ultimately |
| 6 | abandoned the project; |
| 7 | * That the price being offered, yet only affordable if purchased with a |
| 8 | mortgage from UAM, represented the true value of the home even after |
| 9 | the discounts and incentives Defendants provided to the Turners. |

Turners purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on May 8, 2007, in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

37. **Troy Valentine**, 1863 Broken Bit Drive, Plumas Lake, CA 95961. Valentine investigated buying the Lennar built homes in the Subdivision in approximately September through November, 2006. In this September through November time frame up until making the initial offer on his home on November 4, 2006, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers including Valentine with questions relative to the purchase, special incentives and financing, and early move ins. The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In September through November 2006, Valentine directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including

Randee Cruz included written information as follows:

      *      Documents identifying specific home plans that state "any building incentive offered are subject to financing through Universal American Mortgage Company". This advertisement and other documents provided by Randee Cruz regarding "incentives" for using UAM were part of Defendants' scheme to compel Valentine to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit A.

      *      Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" - loan (everything's included) offered solely through UAM and only to buyers of Defendants' homes. The value of this incentive to those who purchase Defendants' homes was $10,000 plus other seller incentives alleged below. The incentive included a waiver of the non-recurring closing costs. This brochure provided by Randee Cruz regarding "incentives" for using UAM were part of the scheme to compel Valentine to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price.

      *      Collateral marketing pieces provided to Valentine which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to Valentine's belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed. Exhibit B.

      *      Mock ups, maintained by Defendants in the model homes sales office,

showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown. These mock ups contributed to Valentine's belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $115,000 just for purchase price incentive not to mention other additional payment, compelled Valentine to use UAM to enable them to afford and purchase the home (these large incentives were not offered to Valentine when inquiring as to other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to Valentine's belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign on occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to Valentine's belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to Valentine in the model homes during this time confirming the above written promises and made additional promises that included:

* The failure to use UAM results in a loss of the over $125,000 incentive toward the purchase price;

* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

* That all Subdivision improvements would be completed, and in a short period of time;

* That because of the home and improvements in the to-be-completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing her home would be a sound financial investment, a fact that was false because the

conditions and completion never occurred and Defendants ultimately

abandoned the project;

* That the price being offered, yet only affordable if purchased with a

mortgage from UAM, represented the true value of the home even after

the discounts and incentives Defendants provided to Valentine.

Valentine  purchased the home by way of executing the "Purchase Agreement and

Deposit Receipt and Escrow Instructions" on November 4, 2006, in reliance of the above

specific representation and as a victim to the Defendants' fraudulent scheme which included the

above representations that were false and part of the fraudulent scheme to deceive home buyers

as alleged further below.

38.    ***Greg and Virginia Weitzel***, 1389 High Noon Drive, Plumas Lake, CA 95961.

Weitzel investigated buying the Lennar built homes in the Subdivision in approximately January

through March 2007.  In this January through March time frame up until making the initial offer

on their home on March 16, 2007, Defendants employed "New Home Consultants" to market the

Defendants' homes and products from sales offices at the Subdivision and to whom Defendants

directed potential buyers including the Weitzels with questions relative to the purchase, special

incentives and financing, and early move ins.  The New Home Consultants were stationed at the

model home sales offices at the Subdivision to market and sell Defendants' products 7 days a

week.

In January through March 2007, Weitzel directed inquiries to the New Home Consultants

as instructed by Lennar in marketing brochures and were provided information about the

Defendants' products including the homes, the UAM financing, the incentives, and monetary

penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including

Randee Cruz included written information as follows:

* Documents identifying specific home plans that state "any building

incentive offered are subject to financing through Universal American

Mortgage Company".  This advertisement and other documents provided

by Randee Cruz regarding "incentives" for using UAM were part of Defendants' scheme to compel the Weitzels to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price.  Exhibit A.

* Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" - loan (everything's included. . ) offered solely through UAM and only to buyers of Defendants homes.  The value of this incentive to those who purchase Defendants' homes was $8,000 plus other seller incentives alleged below.  The incentive included a waiver of the non-recurring closing costs.  This brochure provided by Randee Cruz regarding "incentives" for using UAM were part of the scheme to compel the Weitzels to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price.  Exhibit B.

* Collateral marketing pieces provided to the Weitzels which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to the Weitzels' belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the

surrounding general infrastructure shown.  These mock ups contributed to
Weitzels' belief that Defendants would complete the Subdivision and
infrastructure, facts which Defendants had no basis to believe were true at
the time and at the time of filing this action had not been completed.

*     A form of a "Purchase Agreement and Deposit Receipt and Escrow
Instructions" for the promised home and surrounding completed
improvements. That proposed agreement stated specifically that "funds
will not be released from escrow upon purchase until and unless all the
common areas and improvements within that phase will be completed";
significant financial incentives to use Defendant UAM, which were so
significant that the incentives in the amount of $125,000 just for purchase
price incentive not to mention other additional payment, compelled the
Weitzels to use UAM to enable them to afford and purchase the home
(these large incentives were not offered to the Weitzels when inquiring as
to other homes from other builders).

*     Recorded Covenants, Conditions and Restrictions which identified and
restricted development to a community free of nuisance and irregularity
with homes to be occupied by single families and constructed in a typical
architecturally-controlled safe and stable suburban neighborhood and
which further specially confirm that constructing residential dwellings and
incidental improvements is "essential to the establishment and welfare of
the Development." This document additionally contributed to the
Weitzels' belief that Defendants would complete the Subdivision and the
infrastructure, not abandon it.

*     The Department of Real Estate Public Report issued to every potential
purchaser as part of the California mandated disclosure which states that
Defendant intends to sell all of the lots in the community, that buyers who
sign on occupancy agreement will be required to live in the homes for at

least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to the Weitzels' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to Weitzel in the model homes during this time confirming the above written promises and made additional promises that included:

*        The failure to use UAM results in a loss of the over $133,000 incentive toward the purchase price;

*        That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

*        The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

*        That all Subdivision improvements would be completed, and in a short period of time;

*        That because of the home and improvements in the to-be-completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing their home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

*        That the price being offered yet only affordable if purchased with a mortgage from UAM, represented the true value of the home even after

the discounts and incentives Defendants provided to Weitzel.

Weitzels  purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on March 16, 2007, in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

39.    ***Christopher and Monique White***, 1874 Broken Bit Drive, Plumas Lake, CA 95961.  White investigated buying the Lennar built homes in the Subdivision in approximately January through August 2006.  In this January through August time frame up until making the initial offer on their home on August 15, 2006, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers including the Whites with questions relative to the purchase, special incentives and financing, and early move ins.  The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In January through August 2006, White directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants financing, by those consultants.

This information provided by the then attendant New Home Consultants including Kelly Lake included written information as follows:

       \*        Documents identifying specific home plans that state "any building incentive offered are subject to financing through Universal American Mortgage Company".  This advertisement and other documents provided by Kelly Lake regarding "incentives" for using UAM were part of Defendants' scheme to compel the Whites to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff,  an

1    artificially inflated price.  Exhibit A.

2    *    Marketing brochures that advertise Defendant UAM as a mortgage

3         provider of an "ei" - loan (everything's included. . ) offered solely through

4         UAM and only to buyers of Defendants homes.  The value of this

5         incentive to those who purchase Defendants homes was $8,000 plus other

6         seller incentives alleged below.  The incentive included a waiver of the

7         non-recurring closing costs.  This brochure provided by Kelly Lake

8         regarding "incentives" for using UAM were part of the scheme to compel

9         the Whites to purchase the home at an inflated price because the

10        "incentives" provided the only means for the Plaintiffs to purchase the

11        homes at, at the time unknown to Plaintiff,  an artificially inflated price.

12        Exhibit B.

13   *    Collateral marketing pieces provided to the Whites which showed the

14        Subdivision with completed homes, sidewalks, named streets, curb and

15        gutter, common areas, parks, and surrounding infrastructure, including

16        promised road ingress and egress, improvements which contributed to the

17        Whites' belief that Defendants would complete the Subdivision and

18        infrastructure, fact which Defendants had no basis to believe were true at

19        the time and at the time of filing this action had not been completed.

20   *    Mock ups, maintained by Defendants in the model homes sales office,

21        showing the lots and homes to be constructed and sold in the community

22        which specifically show the Subdivisions completed, with the homes built

23        out, the sidewalks and roads providing ingress and egress to the

24        communities completed, the parks and common areas completed, the

25        surrounding general infrastructure shown.  These mock ups contributed to

26        Whites' belief that Defendants would complete the Subdivision and

27        infrastructure, facts which Defendants had no basis to believe were true at

28        the time and at the time of filing this action had not been completed.

* A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $50,575 just for purchase price incentive not to mention other additional payment, compelled the Whites to use UAM to enable them to afford and purchase the home (these large incentives were not offered to the Whites when inquiring as to other homes from other builders).

* Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to the Whites' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

* The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign on occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to the Whites' belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

The New Home Consultants also made oral representations to White in the model homes during this time confirming the above written promises and made additional promises that included:

* The failure to use UAM results in a loss of the over $58,000 incentive toward the purchase price;

* That to have the opportunity to qualify and purchase a home in the Subdivision they had no choice but use UAM and to purchase from anyone other than Defendants in any other community in the Sacramento area would result in a loss of significant money and lost opportunity to buy in this unique community.

* The neighborhood would have a park to serve the community and buffer the Subdivision from freeway ingress and egress (which subsequently became an asphalted park and ride), proximate grocery store, professional offices and gas station;

* That all Subdivision improvements would be completed, and in a short period of time;

* That because of the home and improvements in the to be completed subdivision, the significant financial incentives offered by UAM and the seller; restrictions imposed by the CC&R's, purchasing their home would be a sound financial investment, a fact that was false because the conditions and completion never occurred and Defendants ultimately abandoned the project;

* That the price being offered, yet only affordable if purchased with a mortgage from UAM, represented the true value of the home even after the discounts and incentives Defendants provided to White.

White purchased the home by way of executing the "Purchase Agreement and Deposit Receipt and Escrow Instructions" on August 15, 2006, in reliance of the above specific representation and as a victim to the Defendants' fraudulent scheme which included the above

representations that were false and part of the fraudulent scheme to deceive home buyers as alleged further below.

40.   ***Thomas Williams and Makeiba Scott***, 906 Calabrese Way, Plumas Lake, CA 95961. Williams/Scott investigated buying the Lennar built homes in the Subdivision in approximately March through July 2007. In this March through July time frame up until making the initial offer on their home on July 21, 2007, Defendants employed "New Home Consultants" to market the Defendants' homes and products from sales offices at the Subdivision and to whom Defendants directed potential buyers including the Williams/Scott with questions relative to the purchase, special incentives and financing, and early move ins. The New Home Consultants were stationed at the model home sales offices at the Subdivision to market and sell Defendants' products 7 days a week.

In March through July 2007, Williams/Scott directed inquiries to the New Home Consultants as instructed by Lennar in marketing brochures and were provided information about the Defendants' products including the homes, the UAM financing, the incentives, and monetary penalties and prohibition for not using Defendants' financing, by those consultants.

This information provided by the then attendant New Home Consultants including Edith Woodruff included written information as follows:

   *      Documents identifying specific home plans that state "any building incentive offered are subject to financing through Universal American Mortgage Company". This advertisement and other documents provided by Edith Woodruff regarding "incentives" for using UAM were part of Defendants' scheme to compel Williams/Scott to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff, an artificially inflated price. Exhibit A.

   *      Marketing brochures that advertise Defendant UAM as a mortgage provider of an "ei" - loan (everything's included. . ) offered solely through UAM and only to buyers of Defendants homes. The value of this

incentive to those who purchase Defendants homes was $10,000 plus other seller incentives alleged below.  The incentive included a waiver of the non-recurring closing costs.  This brochure provided by Edith Woodruff regarding "incentives" for using UAM were part of the scheme to compel Williams/Scott to purchase the home at an inflated price because the "incentives" provided the only means for the Plaintiffs to purchase the homes at, at the time unknown to Plaintiff,  an artificially inflated price.  Exhibit B.

* Collateral marketing pieces provided to Williams/Scott which showed the Subdivision with completed homes, sidewalks, named streets, curb and gutter, common areas, parks, and surrounding infrastructure, including promised road ingress and egress, improvements which contributed to Williams/Scott's belief that Defendants would complete the Subdivision and infrastructure, fact which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* Mock ups, maintained by Defendants in the model homes sales office, showing the lots and homes to be constructed and sold in the community which specifically show the Subdivisions completed, with the homes built out, the sidewalks and roads providing ingress and egress to the communities completed, the parks and common areas completed, the surrounding general infrastructure shown.  These mock ups contributed to Williams/Scott's belief that Defendants would complete the Subdivision and infrastructure, facts which Defendants had no basis to believe were true at the time and at the time of filing this action had not been completed.

* A form of a "Purchase Agreement and Deposit Receipt and Escrow Instructions" for the promised home and surrounding completed improvements. That proposed agreement stated specifically that "funds

will not be released from escrow upon purchase until and unless all the common areas and improvements within that phase will be completed"; significant financial incentives to use Defendant UAM, which were so significant that the incentives in the amount of $44,750 just for purchase price incentive not to mention other additional payment, compelled the Williams/Scott to use UAM to enable them to afford and purchase the home (these large incentives were not offered to Williams/Scott when inquiring as to other homes from other builders).

   *  Recorded Covenants, Conditions and Restrictions which identified and restricted development to a community free of nuisance and irregularity with homes to be occupied by single families and constructed in a typical architecturally-controlled safe and stable suburban neighborhood and which further specially confirm that constructing residential dwellings and incidental improvements is "essential to the establishment and welfare of the Development." This document additionally contributed to Williams/Scott's belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

   *  The Department of Real Estate Public Report issued to every potential purchaser as part of the California mandated disclosure which states that Defendant intends to sell all of the lots in the community, that buyers who sign on occupancy agreement will be required to live in the homes for at least a year, and that the streets, which had not at the time been completed, would be completed by the Defendants. This document additionally contributed to Williams/Scott's belief that Defendants would complete the Subdivision and the infrastructure, not abandon it.

  The New Home Consultants also made oral representations to Williams/Scott in the model homes during this time confirming the above written promises and made additional promises that included:

1       *       The failure to use UAM results in a loss of the over $55,000 incentive

2               toward the purchase price;

3       *       That to have the opportunity to qualify and purchase a home in the

4               Subdivision they had no choice but use UAM and to purchase from

5               anyone other than Defendants in any other community in the Sacramento

6               area would result in a loss of significant money and lost opportunity to

7               buy in this unique community.

8       *       The neighborhood would have a park to serve the community and buffer

9               the Subdivision from freeway ingress and egress (which subsequently

10             became an asphalted park and ride), proximate grocery store, professional

11             offices and gas station;

12      *       That all Subdivision improvements would be completed, and in a short

13             period of time;

14      *       That because of the home and improvements in the to be completed

15             subdivision, the significant financial incentives offered by UAM and the

16             seller; restrictions imposed by the CC&R's, purchasing her home would

17             be a sound financial investment, a fact that was false because the

18             conditions and completion never occurred and Defendants ultimately

19             abandoned the project;

20      *       That the price being offered, yet only affordable if purchased with a

21             mortgage from UAM, represented the true value of the home even after

22             the discounts and incentives Defendants provided to Williams/Scott.

23       Williams/Scott  purchased the home by way of executing the "Purchase Agreement and

24    Deposit Receipt and Escrow Instructions" on July 21, 2007, in reliance of the above specific

25    representation and as a victim to the Defendants' fraudulent scheme which included the above

26    representations that were false and part of the fraudulent scheme to deceive home buyers as

27    alleged further below.

28       41.     Beginning around 2006, Lennar Corporation directed its subsidiaries to

implement a scheme to increase the number of homes sold and to increase the amount of profit per sale and increase its power over the new home sales marketplace.

42.     As previously alleged, specifically in paragraphs 24 through 40, Defendants' scheme consisted of misrepresenting the true value of Defendants' homes and the underlying pricing structure of the Defendants' products.  Defendants coerced, forced, and deceived Plaintiffs into purchasing Defendants' products through the use of illusory high dollar incentives through the use of UAM as the mortgage company.  UAM was able to provide mortgages for homes sold at inflated values at no-risk.  Only buyers of Defendants' homes could finance through UAM, and only through the use of UAM could buyers, including Plaintiffs, receive significant incentive discounts on Defendants' homes.  This scheme caused Plaintiffs to unknowingly purchase their homes at artificially inflated prices within the localized, relatively isolated, and therefore readily controlled marketplace in reliance on both the expressly made and implied representations that the appreciated home values would continue to rise and would outperform competing markets elsewhere in the region and that Defendants would complete the Subdivision and infrastructure as promised.  Further, the scheme caused Plaintiffs to purchase Defendants' products (homes, financing, title services, appraisal services), all at inflated prices to Plaintiffs, for the profit of Defendants and without any interference by regular market forces.

In reliance upon such representations, the Plaintiffs did pay the artificially inflated asking prices for the Defendants' homes; and did  expend significant sums in down payments to secure the financing that was mandated, did pay excessive fees for the financing through UAM, and did enter into mortgages which were economically harmful to Plaintiffs, but beneficial to the profits of Defendants.

43.     Defendants' scheme depended on, and was facilitated by, the fact that Lennar could use a Lennar Corporation subsidiary and affiliates to accomplish each and every phase of a home sale transaction.  A Lennar subsidiary would build the homes, a Lennar subsidiary would market them, a Lennar subsidiary would act as broker, a Lennar subsidiary would be the seller, and a Lennar subsidiary would provide financing to the buyers. In addition, a Lennar-friendly appraiser would appraise the properties for UAM with artificially inflated values thereby

deceiving Plaintiffs to purchase the homes with the supposed "incentives" which really did not even support the sale of the homes to Plaintiffs at current market value. In this way, no outside party (true market forces) would play a role in the transaction and Lennar could control every aspect of each sale. Moreover, and most significantly, Lennar could **ensure** that its sales were not constrained by the requirements that other lenders might impose to ensure that buyers were qualified and could afford their homes, or by appraisals from independent appraisers that could interfere with Lennar's plans to inflate the prices of the homes it was selling. In fact, almost all of the Plaintiffs herein were required by Lennar, as an express or implied condition that, in order to purchase the home, the Plaintiffs use UAM as their mortgage company.

44.     As alleged in paragraphs 24 - 40 above, Defendants coerced buyers into obtaining mortgages for homes at artificially inflated values, with the illusory "incentives" as the enticement to purchase homes, at costs for which they were not qualified with other lenders and in other neighborhoods.  Plaintiffs entered into these mandated loan-financing agreements in reliance on the Defendants' promises that the market values would continue to appreciate and that the Subdivision would be completed with the promised infrastructure, thus inducing and otherwise coercing buyers to pay the inflated prices throughout the communities, as demanded by Defendants. Defendants did this explicitly to manipulate the market resulting in Plaintiffs unknowingly paying over-market price for their homes.

The increased demand resulted in increased sales and profits by the Defendants. The increased sales, at the artificially inflated and controlled prices, by means of comparison appraisals of homes sold by Lennar and financed by UAM, caused the market to further inflate, thereby limiting the supply which, in turn, spurred renewed demand by investors and the buying public to purchase in an area of demonstrated appreciation, which again artificially promoted demand, spurred sales, and all of which increased the Defendants' profits and unfairly competed with the other home-sellers and mortgage companies in the market place.

Moreover, because the Defendants controlled the appraisal process, and also controlled access to financing, the Defendants did also further control the very access to the Greater Sacramento Area market place.  Just as the Defendants schemed, the economic cycle continued

as a direct consequence of the financing, additional credit worthiness, inflated illusory "incentives" and supporting appraisals of the inflated home prices that the Defendants' provided.

By purposefully implementing their scheme, the Defendants represented a market demand that was false and artificial together with a manipulated, and ever increasing, appreciation in home value, upon which the buyers, including the Plaintiffs, relied to make their purchase. The Defendants, through its marketing division, its' marketing personnel, local sales offices (and specifically identified New Home Consultants), and UAM, perpetrated a false, misleading, and manipulative marketing scheme designed to coerce homebuyers, including the Plaintiffs, to purchase Defendants' products.

Defendants, and each of them, knew or should have known that these promises were indeed false and/or misleading and that the market values were not real because they related solely to the Defendant's ability to raise prices and complete the Subdivision and infrastructure. The inflated price was tied to the Defendant's ability to raise and otherwise control the purchase price was directly commensurate with Plaintiffs' ability to obtain money as facilitated by the Defendant and the false representations about the completion of the community and its infrastructure. The Defendants, not market forces, controlled the marketplace with no risk to themselves. The Defendants' sole intent was to drive the home prices ever upward in order to sell at greater and greater profits to a group of buyers, including Plaintiffs.

45. Defendants' scheme also depended on the fact that, because of the existence of loan securitization, Defendants would not be required to absorb the foreclosures that would result from providing financing to unqualified buyers. Instead, Defendants guaranteed their own profit, without accepting the inevitable losses, by immediately selling the loans they had underwritten to third-party banks and other financial entities. These financing businesses then would often resell the loan, further isolating Defendants from the likelihood of loss from the risky loans.

46. Defendants also increased sales and inflated prices in their developments, by selling houses with high incentives and manipulated appraisals to Plaintiffs as alleged in paragraphs 24 through 40 above, based on the scheme alleged herein and in part on the promises

1   to complete the Subdivisions and the surrounding infrastructure..

2       47.     In order to implement their scheme, however, it was necessary for Defendants to

3   conceal the truth about the neighborhoods they were building. Defendants convinced

4   government entities, then the community, and finally buyers that Defendants were building

5   traditional neighborhoods with stable owners who occupied their homes and who were vested in

6   the community and neighborhood and who were financially capable of owning the subject

7   homes.

8       48.     This scheme went so far as to require early buyers in the subdivision to have

9   exceptional credit and put a high down-payment on the home.  Defendants did not require that

10  subsequent buyers would have to meet the same stringent qualifications.  This requirement was

11  specifically made to all Plaintiffs as alleged specifically above. This was done with the

12  knowledge of Defendants and the intent of Defendants to then sell the homes and to provide

13  mortgages to those not properly qualified and for amounts not supported or supportable by

14  comparative homes not sold and financed by Defendants.

15      49.     Further, implicit in that marketing scheme was that Defendants were making a

16  good faith effort to sell homes to those buyers that the Defendants expected could afford to buy

17  in what would be a stable neighborhood and at prices that would remain stable.  In reality,

18  Defendants' scheme trapped the initial phase buyers into homes that, when subsequent homes

19  were sold to unqualified buyers resulting in foreclosures, short-sales and abandonment,

20  significantly depreciated Plaintiffs' homes' comparison value thereby erasing the Plaintiffs'

21  equity in the form of their down payments. This had the effect of locking them into negative

22  loan- to-value ratios with respect to their individual properties, and otherwise eliminating access

23  to credit and to other financial opportunities that the typical home buyer, including the Plaintiffs,

24  had come to expect from home ownership.

25      As a direct result of the Defendants' scheme, the Plaintiffs' creditworthiness has been

26  severely and negatively impacted, and Plaintiffs have lost, and continue to lose, significant

27  financial opportunities.  They are left without the ability to refinance their homes to secure lower

28  payment options and are forced to pay the higher adjusted monthly house payments that were

foisted upon them. They cannot refinance their homes in order to tap into the promises of home equity that they had come to understand were promised by the fact of home-ownership. Plaintiffs relied, to their detriment, on the Defendants' promises and are left without the ability to secure some of the more traditional financial opportunities afforded by more stable home values and neighborhoods, including the ability to pay for education, job training, home improvement, and even personal property items to help make their lives more manageable and more easily endured.

In consequence, they have sustained actual damages in the form of lost down payment, equity, and unexpected, unreasonable, and excessive increases in monthly house payments; and other consequential damages caused by the inability to refinance occasioned by the negative loan-to-value ratios under which they now struggle. Such consequential "business" losses include but are not limited to: lost opportunities for career advancement, education, and/or job training, lost opportunities to invest in or otherwise improve real property. In addition, the Plaintiffs have suffered in their homes and businesses, due to the negative impact on their creditworthiness, from an inability to pay as promised resulting in repossession of personal assets and business assets, short sales, foreclosures, an inability to sell their homes, and the loss of other financial opportunities and/or assets.

50.    Defendants' abandonment of the project, and failure to complete the Subdivision and surrounding infrastructure, has now resulted in abandoned houses; multiple families living in one home; transient neighbors with no long-term ties to the neighborhood; unfinished and unkempt yards; and, in some cases, increased crime, and an inability for Plaintiffs to sell their homes at current market prices let alone for what they owe on the home to date.

51.    In addition to, and in conjunction with, the actions to mislead, misrepresent, and defraud the Plaintiffs alleged above, the Defendants' falsely promised, with no intention of keeping the promises, that Lennar would provide to, and maintain for their homebuyers, including the Plaintiffs, neighborhoods that were fully developed with the promised infrastructure.

52.    Defendants then misrepresented, misled, and defrauded their respective buyers, including the Plaintiffs, that the safe and secure family neighborhoods would be adequately

served by requisite public, private, commercial, and retail facilities sufficient to create desirable neighborhoods.

53.    Defendants made these promises to mislead, misrepresent, defraud, and entice the Plaintiffs to move into the Subdivisions which, at the time of sale, enjoyed none of the touted benefits, and which prior to the Lennar Defendants' and other developers' procurement of subdivision entitlements, subdivision improvement, and homebuilding construction, was a wholly undeveloped area completely unsupported by adequate public, private, commercial and retail and other services.

54.    The Defendants, through its marketing division, its marketing personnel, local sales offices and local financing personnel (as specifically alleged in paragraphs 24-40 above) perpetuated a false, misleading, and  manipulative marketing scheme designed to strongly entice homebuyers, including the Plaintiffs, to relocate, sometimes long distances, on the empty promises that later proved to be artificially inflated, of high home values and a stable market place supported by adequate services that would create for them vibrant and viable neighborhoods.  Defendants knew or should have known that these promises were indeed false, and never intended to keep the promises that they made to their buyers.  The false representations and misleading marketing specifically alleged above about the completion of the Subdivisions and infrastructures was one of the primary reasons why Plaintiffs each overpaid for their homes at the time of purchase.

55.    This scheme included both oral and written promises specifically alleged as to each Plaintiff in Paragraphs 24 through 40 above, to build a fully developed community with local amenities and construction of a complete infrastructure consisting of common improvements including the construction of a defined number of fully completed homes of a certain value and quality; parks and recreation facilities; retail outlets and professional spaces.

56.    As specifically alleged in paragraphs 24 through 40 above, to perpetrate the scheme the Defendants used false and misleading advertising, sales brochures, model home displays, sales advertisements, salespersons' oral representations, oral representations by local mortgage representatives, subdivision maps and public reports, zoning maps, newspapers, sales

contract terms, title documents, CC&Rs, appraisals, and mortgage financing terms and agreements.

57.     Such false promises also included the promise to build out all of the homes that were planned within the phase of the homes being sold; to build homes on each lot which had been prepared and readied for construction within the Subdivision prior to Plaintiffs' purchase; to build all the roads that had been planned for construction within the advertised communities and as was advertised within the subdivision; to cause parks and other recreational facilities to be constructed including: the construction of a park at that location that is now a Park-and-Ride facility and accompanying parking lot at the entrance of the Estancia community. The Park-and-Ride facility was never disclosed to the Plaintiffs prior to its' approval and construction and the area residents, including the Plaintiffs, now bear the extra costs associated with previously undisclosed levy fees, and flood insurance requirements with excessive and unplanned-for premiums.

58.     Defendants continue to violate their own CC&Rs. In addition to the Defendants' false and misleading marketing and financing scheme, and as part of the Defendants' common practice of false promises as alleged above, the Defendants prepared, recorded, and provided during escrow to each home buyer, a document entitled Covenants, Conditions and Restrictions (CC&Rs) to further emphasize the stable, safe, secure and desirable nature of the Subdivision and the contained communities.

59.     Generally, the CC&Rs set forth conditions and restrictions of living in the Subdivision that require owners of lots to keep the lots maintained, the structures uniform, and the community free of business activity.

60.     The CC&Rs further prohibit the creation or maintaining of a condition of any of the lots as a nuisance.

61.     Finally the CC&Rs provide for a right of enforcement of any violation of the CC&Rs by any owner including Plaintiffs.

62.     Plaintiffs would not have agreed to purchase their homes in the Subdivision had they been aware of the unlawful scheme alleged in this Complaint.

63.     Plaintiffs have discovered the fraud, misrepresentations, and unlawful acts alleged herein within three years from filing of the original Complaint and were unable to earlier discover the fraud, misrepresentations, and unlawful scheme alleged above with reasonable diligence because:

a.      The fact that the purchase price paid for the homes was artificially inflated, compared to other non-Lennar homes in the Sacramento area, was not known or knowable to Plaintiffs until they attempted to refinance their homes, and the appraisals by non-Defendant appraisers for mortgage providers other than UAM revealed that the price paid at the time of purchase was excessive and that the inflated price was not supported by comparable properties, so that the homes were in fact purchased "upside down" on loan to value. Plaintiffs Bhakta learned after their refinance in 2009, Lewerenz in 2009, Lopes in 2011, Turner in 2011, and Williams/Scott inquired about refinancing in 2009 and found out that they could not because the home was "upside down". These Plaintiffs subsequently told the other Plaintiffs in this action about their experience in trying to refinance and the fact that they learned that the homes were overpriced at the time of purchase compared to others in the area. Plaintiffs Bhakta, Carreras, Escareno, Irving, Lewerenz, Lopes, Lorica, Maschiovecchio, O'Keefe, Peterson, Sakellariou, Salazar, Turner, Valentine, Weitzel, White, and Williams/Scott had no basis to believe that they paid too much at the time of purchase until the refinancing Plaintiffs identified above informed them of the fact.

b.      The fact that the Defendants were not going to complete the Subdivision and its infrastructure was not known, or knowable, by any of the Plaintiffs until construction stopped, and a lapse of time with no construction activity revealed the construction trailer was going to remain abandoned and no further development of the Subdivision would occur. This gradual

process of abandonment occurred over a period of time and was noticed by Plaintiffs no earlier than 2010 when the trailer remained unmanned, the Lennar trucks stopped appearing, all signs of construction stopped, and the unimproved lots and common areas became full of weeds, overgrown with vegetation, and full of debris. Plaintiffs Bhakta, Carreras, Escareno, Irving, Lewerenz, Lopes, Lorica, Maschiovecchio, O'Keefe, Peterson, Sakellariou, Salazar, Turner, Valentine, Weitzel, White, and Williams/Scott each noticed that the construction trailer remained at the project but there was no activity in or around the trailer beginning in early 2010, and they began to investigate whether Lennar was going to return to complete the project and its infrastructure. Carrera learned from contractors in summer 2009 that they were going to stop building soon at the subdivisions. At no time did Lennar inform any of the Plaintiffs that it was abandoning completion of the Project. Lennar simply walked off the job, leaving the Project unfinished with the undeveloped land overgrown with weeds and littered with debris, facts which became known to Plaintiffs after they investigated the lack of activity and the run down nature of the Subdivisions. None of these Plaintiffs have, even to date, been told the Subdivisions and infrastructure will not be completed, but because of the investigation they each undertook and the Defendants' response to this lawsuit, and the fact that the trailer was finally removed within the last three months of 2012, they believe the project is abandoned. None of the Plaintiffs are able to provide a precise date when these events occurred. However, each Plaintiff became aware no earlier than the beginning of 2010 that these conditions were present and persistent. Defendants have not taken any action since early 2010 to complete the Subdivision or the infrastructure.

1    c.    Each of the Plaintiffs in this action learned, just prior to filing the initial
2          Complaint in this action, that Defendants took the money from escrow and
3          closed escrow despite the express contract terms requiring otherwise,
4          without completing the construction of the improvements and common
5          areas within the phases of Plaintiffs' homes.  Each of the Plaintiffs in this
6          action were informed by their counsel that each of their escrows had
7          closed, the contract required that the escrow not close without completion
8          of the specified infrastructure, and the specified infrastructure was not
9          completed.  This information was provided to Plaintiffs in January 2012.
10         None of the Plaintiffs were put on notice, by Defendants, that Defendants
11         had taken the funds from escrow and none of the Plaintiffs had any reason
12         to investigate this breach of the several contracts until their retained
13         counsel discovered the breach.
14   d.    In 2009 through 2010 the Turners, Whites, Lewerenzes, Lopeses,
15         Maschiovecchio and Irvings became aware that the model homes had been
16         sold before the project and infrastructure was completed.  Each of these
17         Plaintiffs thought that the sale of the model homes prior to completion of
18         the infrastructure and Subdivision might be a sign that Defendants did not
19         intend to complete what the Defendants had promised and that they
20         overpaid for the home as a result.  They then undertook an investigation
21         which lead to the facts of the fraudulent scheme of defendants alleged in
22         this Complaint.

### FIRST CLAIM FOR RELIEF

### VIOLATION OF INTERSTATE LANDSALES ACT

### UNTRUE STATEMENTS IN THE SALE OF SUBDIVIDED LOTS

### 15 U.S.C. 1703

27   64.    Plaintiffs incorporate the above allegations as though fully stated herein and
28   further allege as follows.

65.    The schemes as alleged above constituted a device, scheme or artifice to defraud the Plaintiffs arising out of their purchase of homes in subdivided lots.

66.    Defendants employed untrue statements of material facts or otherwise omitted to state sufficient material facts in the printed property report and other advertising with respect to information pertinent to the lot or subdivision for financial gain.

67.    Defendants engaged in transaction, practice and course of business through the scheme alleged above that operated or would operate as a fraud or deceit upon Plaintiff purchasers.

68.    Discovery of these violations is as specifically alleged in paragraph 71 above.

69.    As a result Plaintiffs have sustained damages including, but not limited to, loss of down payment equity, lost financial opportunities, loss of creditworthiness, the inability to refinance, loss of value, actual damages in the form of increased costs; and are entitled to restitution, rescission, actual and consequential damages, attorneys' fees and costs pursuant to statute, travel to and from the lot, and any other remedy or remedies available at law and equity.

## SECOND CLAIM FOR RELIEF

## UNFAIR COMPETITION AND BUSINESS PRACTICES

## B&P 17200 ET SEQ.

70.    Plaintiffs incorporate the above allegations as though fully stated herein and further allege as follows.

71.    Defendants' marketing scheme as alleged above including, contracting, financing, sales, and advertising of the Plaintiffs' homes and the other homes in the Subdivision and the abandonment of the Subdivision was fraudulent, deceptive, untrue and/or misleading attempt to wrongfully manipulate and control the market values of the market place, all in violation of federal and state laws against false and deceptive advertising; fraud, misrepresentations and swindles; 15 U.S.C 1703, and, California Bus & Prof Code 17500 et seq., that has resulted in serious detriment to what should have been a free and fair market place into which the Defendants duped the public, including the Plaintiffs, to participate at their peril.  These actions

by the Defendants constitute illegal, unfair or fraudulent business acts or practices and unfair, deceptive, untrue or misleading advertising and/or conspiracy to commit the same.

72.     Plaintiffs relied on the unlawful and misleading acts and were induced to purchase their homes based on those acts and did pay money to Defendants as a result of the unlawful business practice. Plaintiffs were, in fact, injured by these practices by and arising out of their purchase of the properties as alleged above.

73.     As a result of the unfair business practices, Plaintiffs seek all available remedies including restitution of all money paid to Defendants and an injunction to enjoin the unfair business practice of the Defendants.

## THIRD CLAIM FOR RELIEF

## FALSE AND MISLEADING ADVERTISING OR STATEMENTS IN THE SALE OF REAL PROPERTY B&P CODE 17500

74.     Plaintiffs incorporate the above allegations as though fully stated herein and further allege as follows.

75.     Defendants are all either a person, firm, corporation or association or employee thereof as defined in B & P Section 17500, et seq..

76.     Defendants disposed of real property to Plaintiffs by way of the Contracts.

77.     The Plaintiffs were induced to enter into the contracts for the sale of the real property by a scheme of manipulation as bolstered by the false and misleading statements disseminated by Defendants as alleged above. Plaintiffs each paid money to Defendants as a result of the false or misleading advertising.

78.     The unfair market manipulation, false representations and misstatements alleged above were known by Defendants to be false or misleading and were made for the purpose of misleading Plaintiffs and others into purchasing the property.

79.     As a result of the statutory violation, Plaintiffs are entitled to restitution of all money paid to Defendants and an injunction against Defendants enjoining the use of the unlawful scheme, attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF

# RESCISSION BASED ON FRAUD OR MISTAKE
## CALIFORNIA CIVIL CODE SECTION 1689

80. Plaintiffs incorporate the above allegations as though fully stated herein and further allege as follows.

81. As set forth above, Plaintiffs' consent to enter into the Contracts was wrongfully induced and based, at least in part, on the false and deceptive scheme, marketing representations and practices and promises to complete the Subdivision and infrastructure.

82. Plaintiffs entered into the contract based on their reasonable and mistaken belief that they were contracting to purchase a new home that they could afford and which would be completely improved with its own infrastructure, improvements and fully developed neighborhood away from the other cities and suburbs in Sacramento and Marysville/Yuba City as alleged above.

83. The neighborhoods were not as represented, given the Defendants' abandonment of the subdivisions that were never completed as promised, thereby inviting garbage dumping and waste disposal, increased blight and associated crime and thereby exposing the current residents to increased anxiety and a lack of security in their own homes and neighborhoods.

84. Nor are the market values of the Plaintiffs' homes and their down payments what they had actually paid for the homes at the time because of the artificial demand and artificially inflated home values directly caused by the Defendants' scheme to manipulate the market demand and values, and as was further expressly bolstered by the Defendants' marketing of these homes and neighborhoods without any intention of completing them as has been alleged above.

85. Plaintiffs are entitled to rescission of the contracts and consequential damages, including but not limited to, refund of down payments and all principal payments on the properties, repairs, maintenance costs, improvements to the properties, interest on the mortgages, HOA dues, property taxes, attorneys' fees and litigations costs, with pre-judgment interest on all at the legal rate.

# FIFTH CLAIM FOR RELIEF
## VIOLATION OF CC&R's

86.     Plaintiffs incorporate the above allegations as though fully stated herein and further allege as follows.

87.     Plaintiffs are homeowners who have a private right of action against Defendants for violations of the recorded CC&Rs.

88.     Defendants violated and continue to violate the CC&Rs that control the property owners' responsibilities in the Subdivision in that they:

      i.      Failed to keep the lots maintained, the structures uniform, and the community free of business activity, including ownership of multiple income producing properties;          and

      iii.     Abandoned the Subdivision leaving the subdivision in such a condition that it causes a nuisance.

89.     Plaintiffs are entitled to an order from the court compelling Defendants to comply with the CC&Rs and an award of costs of suit.

## REQUEST FOR JURY TRIAL

90.     Plaintiffs request that the trial of this action take place before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

**As to First Claim for Relief:**

1.      Special damages;

2.      Rescission of the purchase;

3.      Restitution;

4.      Consequential damages;

5.      Attorneys fees provided by law;

6.      Cost of this action; and

7.      Any other relief this Court deems just and proper.

**As to Second Claim for Relief:**

1.      Restitution of all monies paid to Defendants as a result of the business practices;

2.      Injunction to stop the business practices

3.      Cost of this action; and

4.      Any other relief this Court deems just and proper.

**As to Third Claim for Relief:**

1.      Restitution of all monies paid to Defendants as a result of the business practices;

2.      Injunction to stop the business practices

3.      Cost of this action; and

4.      Any other relief this Court deems just and proper.

**As to Fourth Claim for Relief:**

1.      Rescission of the purchase contract;

2.      Consequential damages;

3.      Cost of this action; and

4.      Any other relief this Court deems just and proper.

**As to Fifth Claim for Relief:**

1.      An Affirmative Order for Defendants to comply with the CC&Rs

2.      Attorneys' fees and cost of suit;

3.      Any other relief this Court deems just and proper.

Dated: July 14, 2014                                    *VAN DYKE LAW GROUP,*
                                                        *A Professional Corporation*


                                                        By:___/S/ Glen A. Van Dyke_____
                                                        GLEN A. VAN DYKE,
                                                        Attorney for Plaintiffs